UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,       )
)
       Plaintiff,       )
)
      vs.       )       Case No. 4:08CV00207 ERW
)
FRANK L. ZERJAV, SR., et al.,       )
)
       Defendants.       )

## MEMORANDUM AND ORDER

The matter comes before the Court on United States' Motion for Preliminary Injunction [doc. #18]; United States' Motion in Limine to Draw an Adverse Inference Against Tiger Zerjav and All Defendants [doc. #84]; United States' Motion in Limine to Draw an Adverse Inference Against Defendants Based on Michael Montana's Assertion of the Fifth Amendment [doc. #86], and Defendants' Joint Motion to Strike Plaintiff's Additional Affidavits and Memorandum in Support [doc. #88]. In-court Hearings were held on August 1, August 27, August 28, September 8, and September 9, 2008. Upon conclusion of these Hearings, the parties were permitted Post-Hearing Briefing, to begin upon receipt of the transcripts. Briefing was completed on February 12, 2009.

## I. FINDINGS OF FACT[1]

The Government filed a Complaint for Permanent Injunction and Other Relief [doc. #1], pursuant to 26 U.S.C. §§ 7402(a), 7407 and 7408 to permanently enjoin Defendants Frank L.

---

[1] For the sake of convenience, this Court will set forth its Findings of Fact in the order presented at the evidentiary hearing.

Zerjav, Sr. ("Mr. Zerjav"); Frank L. Zerjav, Jr. ("Tiger"); Zerjav & Company, L.C. and Zerjav & Company, P.C. (collectively, "Zerjav & Company"); and Advisory Group U.S.A., L.C. ("Advisory Group") (Zerjav & Company and Advisory Group referred to collectively as "the Zerjav firm") from engaging in income tax preparation and other related activities.

Mr. Zerjav has been a certified public accountant since 1988. He and his son, Tiger, and others employed by them, prepare federal income tax returns and provide tax planning advice through their businesses, Zerjav & Company and the Advisory Group. Mr. Zerjav directs other employees of Zerjav & Company and signs income tax returns prepared by other employees, while Tiger reviews corporate and partnership returns before they are submitted to Mr. Zerjav for final review. The Advisory Group is used to provide information to new customers on various techniques used at Zerjav & Company in return for fees paid by customers. Promotional material "shows owners how to structure and operate with the right entity and apply techniques, tactics and ideas that help make life less taxing. Proven strategies and methods can be implemented that reduce or even eliminate taxes." The Government alleges that the seminars advise customers how to "improperly reduce their reported federal tax liabilities." The Government pleads that

> Defendants' fraudulent tax planning advice and return preparation methods also include having customers:
>
> · Pay shareholders artificially low wages to minimize employment taxes, while making up the difference as distributions and payment of personal expenses;
> · Pay minor children up to $4,800 per year for work the children purportedly perform for a separate Schedule C "staffing company;"
> · Transfer business equipment to a sham trust in the names of customers' children and making corporate lease payments for the same equipment to the trust in order to pay for college tuition; and
> · Deduct such non-deductible personal expenses as cable television, snacks, soda, and golf fees on the corporate return.

(Gov't Complaint, Doc. #1, p.7)

The Government alleges that Defendants' "Fraudulent Return Preparation" includes "bogus transactions involving sham corporations," and that they use corporations to improperly depreciate personal assets. The Government asseverates that Defendants use corporations to depreciate personal assets through bogus transactions involving legitimate corporations and to engage in schemes involving corporate compensation and fraudulent adjustment of journal entries, such as fraudulently classifying distributions as loans, creating sham home and vehicle leases, and making sham wage payments to minor children. The Government also asserts that Defendants obstructed IRS investigations and audits.

The Government seeks relief in Count I under 26 U.S.C. § 7407, to enjoin Defendants from:

A. engaging in conduct subject to penalty under I.R.C. § 6694 (which penalizes a tax return preparer who prepares or submits a return that contains an unrealistic position that is not adequately disclosed or that is frivolous);

B. misrepresenting his experience or education as a tax return preparer; or

C. engaging in any other fraudulent or deceptive conduct that substantially interferes with the proper administration of the internal revenue laws, if the court finds that injunctive relief is appropriate to prevent the recurrence of such conduct. Additionally, if the court finds that a preparer has continually or repeatedly engaged in such conduct, and the court finds that a narrower injunction (i.e., prohibiting only that specific enumerated conduct) would not be sufficient to prevent that person's interference with the proper administration of the internal revenue laws, the court may enjoin the person from further acting as a federal income tax return preparer.

(Gov't Complaint, Doc. #1, p.22)

In Count II, the Government seeks relief under 26 U.S.C. § 7402(a), claiming unlawful interference with the enforcement of the internal revenues laws, and specifically asks for a permanent injunction prohibiting Defendants from:

1. organizing, promoting or selling any entity, plan, or arrangement that advises or assists customers to violate the internal revenue laws or unlawfully evade the assessment or collection of federal tax;

2. making false statements, in connection with such organization, promoting, or selling about the allowability of any deduction or credit, the excludability of any income, or the securing of any tax benefit by reason of participating in any such tax shelter, plan or other arrangement;

3. preparing or filing (or helping to prepare or file) federal tax returns, amended returns, or other related documents and forms for others;

4. engaging in any other activity subject to penalty under IRC §§ 6694, 6695, 6700,6701, or any other penalty provision of the Internal Revenue Code;

5. appearing as representatives on behalf of any person or organization whose tax liabilities are under examination by the Internal Revenue Service;

6. engaging in any other conduct that interferes with the proper administration and enforcement of the internal revenue laws; and

7. engaging in conduct designed or intended to, or having the effect of, obstructing or delaying any Internal Revenue Service investigation or audit.

(Gov't Complaint, Doc. #1, p.25-26).

The Court will examine what is considered as material and relevant testimony adduced at the preliminary injunction hearing which was fragmented, by agreement, over several days. The first day of the hearing was August 1, 2008. The hearing was continued to August 27 and 28, 2008, and continued again to September 8, 2008. The hearing was completed on September 9, 2008. It was agreed that post-trial briefs were to be submitted after receipt of the trial transcripts.

The Government's first witness was Katherine K. McGuire, a broker/realtor associate with Re/Max Properties West in St. Louis. (Trial Tr. Vol.I P.22 L.8-18). Mr. Zerjav prepared her tax

returns for 2004-05. (Trial Tr. Vol.I P.22 L.21-25). When she reviewed her first return, she was concerned because charitable deductions were listed as a business expense, rather than as a personal expense. When she made Mr. Zerjav aware of her concern, he reported to her that it would be more beneficial to her to leave it where he had categorized it. She insisted that it be reconfigured, and the charitable deduction was moved to Schedule C. (Trial Tr. Vol.I P.23 L.18-P.18 L.9). She ceased using the Zerjav firm, noting that she was dissatisfied with the way the firm practiced. She also testified that she had a fee dispute with the firm, specifically that she was charged three times the amount Mr. Zerjav advised her the bill would be when he was employed. (Trial Tr. Vol.I P.27 L.6-9, P.28 L.17-22, P.29 L.1-12).

The Government next called Harry Charles, a Missouri licenced attorney and certified public accountant, who limits his practice to tax disputes involving audits, collection and criminal tax cases. He represented "at least a dozen" former Zerjav clients before the Internal Revenue Service. (Trial Tr. Vol.I P.45 L.7-22, P.48 L.19, P.49 L.14-50). In the cases he saw, Mr. Zerjav had not supplied documents to the Internal Revenue Service to support "the items claimed on the returns." For example, with respect to meals and entertainment, the log was lacking, "[t]here was no evidence." (Trial Tr. Vol.I P.51 L.12-15, P.52 L.3-7). Across the returns he saw, "[t]here were some expense categories that, from my experience, were unusual, like staffing support, facilities support. There were travel expenses that you saw across returns, rental payments from corporations to individuals, for example." He also observed a lack of officer compensation for S-corporations. Taxpayers had corporations formed and did not show officer compensation. On the returns, he observed the use of children or spouses to perform services through other corporations to the taxpayer's corporation. (Trial Tr. Vol.I P.53 L.9-P.54 L.7). He testified that

for cases "that were in appeals," taxpayers "were offered the opportunity to adjust the returns if the taxpayers and their representatives believed that there were items that needed adjusting." (Trial Tr. Vol.I P.54 L.20-P.55 L.2).  There was one return he examined where he saw nothing that appeared questionable.  (Trial Tr. Vol.I P.55 L.14-20).  He attended a meeting where he was told that the Internal Revenue Service was examining "these returns" and "then invited the practioners to look at the same items and see whether we agreed there were adjustments to be made."  (Trial Tr. Vol.I P.56 L.14-18).

On cross-examination, Mr. Charles testified that he was familiar with the Internal Revenue Service transmittal letter which provided that the power of attorney for the taxpayer was given the "option of filing amended returns with the agents who were working returns in this project. The offer was made by the coordinators of the project."  The offer provided that the taxpayer would provide amended returns and an affidavit, and would pay penalties of the greatest deficiency.  The agency would accept the amended returns if they appeared reasonable and would not pursue penalties for more than one year.  (Trial Tr. Vol.I P.60 L.15-16, P.61 L.4-21) (Def. Ex. No.48).  This offer was accepted on behalf of the taxpayers Mr. Charles represented.

Next, the Government called Terry Altepeter, a certified public accountant, associated with a firm in St. Louis County, who worked as an independent contractor briefly for Zerjav & Company and the Advisory Group in the Fall of 2007.  (Trial Tr. Vol.I P.79 L.19-P.20 L.5, P.81 L.6, P.81 L.17-25).  He testified that Zerjav & Company is primarily involved in accounting and income tax preparation and the Advisory Group provides advisory services and seminars to clients.   Mr. Altepeter was not involved with the Advisory Group.  (Trial Tr. Vol.I P.82 L.1-8). He testified that Mr. Zerjav owns both companies and manages the entire practice, delegating

responsibilities to various staff, and he reviews returns. (Trial Tr. Vol.I P.82 L.12-18, 22-P.83 L.1). Tiger reviewed corporate income tax returns. (Trial Tr. Vol.I P.84 L.13-20). He explained that an S-corporation is a corporation that makes an election under the tax laws to receive special treatment on some elements of income and expense. It is taxed similarly to a partnership, and does not pay income tax on net earnings, rather the earnings pass through to the corporate owners, who pay tax on those earnings on their individual returns. (Trial Tr. Vol.I P.84 L.22-P.85 L.3). While employed at Zerjav & Company, Mr. Altepeter would go through data, making sure that there was proper accounting for everything concerning income and expenses in preparing returns. He presumed that Tiger would review the return and that Mr. Zerjav ultimately signed the return. (Trial Tr. Vol.I P.85 L.8-21).

The reason Mr. Altepeter did not "stick around at Zerjav & Company" was because "I got to the point where I was just becoming uncomfortable with the way things were being done . . . the way some deductions were being handled, the way some - - some business transactions were being dealt with. It was just a combination of a lot of things." (Trial Tr. Vol.I P.85 L.25-P.86 L.12). He testified that the way the firm handled corporations and leased automobiles from corporate shareholders made him uncomfortable. (Trial Tr. Vol.I P.88 L.21-24). He explained in his testimony what he believed to be the proper way to handle automobile tax deductions. He testified that he did not see the personal usage of a business-provided automobile included in the compensation of the business owner on the owner's personal return. He also did not see the lease income that the corporation paid the owner on the personal return of the owner. He testified that the way personal usage was deducted off the automobile expenses was sometimes inconsistent. (Trial Tr. Vol.I P.89 L.19-P.90 L.17). Mr. Altepeter was not testifying as to what he saw on

other returns since he prepared the returns correctly, thus the source of this information is not clear, and the testimony is irrelevant. He said there were inconsistencies from year to year with the way leased automobiles, above a certain minimum value, were treated on the Internal Revenue Service publication tables. He did not raise the issue with Tiger. (Trial Tr. Vol.I P.91 L.5-P.92 L.4). For the most part, he did not object to the way Zerjav & Company prepared items relating to medical reimbursement plans, "because they were consistent with returns that I had done in the past, but [he] did take an issue with how medical expense reimbursements were handled for [S]-corp shareholders." (Trial Tr. Vol.I P.94 L.7-13). He explained that, in his experience, medical insurance premiums are not deductible for S-corporation shareholders, but are nondeductible expenses passed through to the shareholder and picked up as a deduction on the personal return. (Trial Tr. Vol.I P.94 L.16-P.95 L.20). He never asked Tiger about the position the Zerjav & Company was taking on the returns, but Tiger did give him instruction to "put them all together and show them as health insurance deductions," and he disagreed with that. (Trial Tr. Vol.I P.95 L.3-20). He also disagreed with Zerjav & Company's position regarding business meals, "[o]nly from the standpoint of a lot of their clients had two categories of business meals." (Trial Tr. Vol.I P.95 L.21-25). He never voiced any disagreement over deductions claimed for home office space by a corporation while he was at the firm. (Trial Tr. Vol.I P.96 L.15-18).

On cross-examination, Mr. Altepeter testified that he never discussed any questions regarding vehicle leasing with either Mr. Zerjav or Tiger. (Trial Tr. Vol.I P.112 L.24-P.113 L.9). He testified that there was "no memorandum or any kind of communication that [he] would have generated to any person in the office regarding [his] concern with the way vehicle leasing was being handled." (Trial Tr. Vol.I P.113 L.5-9). Likewise, he never discussed with Tiger or Mr.

8

Zerjav issues with medical reimbursement plans, and he never generated any memos or anything to document his concern. (Trial Tr. Vol.I P.116 L.18-P.117 L.2). Regarding home deductions, Mr. Altepeter never had any conversations with Tiger about "home offices and their deductions," and had only one conversation with Mr. Zerjav on that subject which occurred after a meeting with an Internal Revenue Service auditor. The auditor raised the issue of rent expense for a home office. Mr. Zerjav responded to the auditor that it was not rent expense, but was, instead, a reimbursement. Mr. Altepeter responded to Mr. Zerjav "[y]ou know, I've had the same question myself as to whether or not that would be the case." (Trial Tr. Vol.I P.118 L.9-P.119 L.11)

When Mr. Altepeter disassociated with Zerjav & Company, he told Mr. Zerjav "that I was uncomfortable with the environment." (Trial Tr. Vol.I P.122 L.10-11). Mr. Altepeter's testimony, which the Court finds altogether truthful, fails, in the Court's judgment, to support any of the Government's claims against Defendants.

Dianna Lynn Beers is an Internal Revenue Agent employed by the Internal Revenue Service where she has worked for two and one-half years. (Trial Tr. Vol.I P.129 L.1-15). She was assigned 20 to 29 Zerjav & Company cases to audit. (Trial Tr. Vol.I P.132 L.8-12). She testified that she conducted the audits "as I would any other audit." (Trial Tr. Vol.I P.132 L.13-16). She prepared an audit report, which she described as a report of findings by the revenue agent after the audit has been conducted. The report of findings is made after examining the books and records and the tax return, and gives the results of the examination. The report is given to the taxpayer and his or her power of attorney, if the person has a power of attorney, along with a letter which notifies the taxpayer of the availability of a thirty-day period to submit

additional documentation or information that might be helpful in altering the report. The taxpayer may also protest the audit. (Trial Tr. Vol.I P.133 L.1-24).[2]

Michael J. DeMauro, Jr. owns and operates a "manufacture rep" company, Power Source Midwest, Incorporated, that sells stand by generators and lab centers. (Trial Tr. Vol.I P.149 L.9-P.150 L.2). Mr. Zerjav prepared his income tax returns for the years 2000-2005, as well as "preliminarily" preparing the return for 2006, until another preparer was hired. (Trial Tr. Vol.I P.150 L.6-17). Mr. DeMauro testified, "[t]hey set up a corporation called the Power Group and later set up a corporation called Source Concepts." (Trial Tr. Vol.I P.151 L.15-17). "The S-corp was Power Source Midwest, Inc., and then The Power Group was set up as a C-corporation, which was operated by my wife." "Source Concepts was set up in 2001 as a Nevada corporation, and I really never understood the purpose of that corporation." (Trial Tr. Vol.I P.151 L.18-P.152 L.2). He then testified, at length, about the purpose of Source Concepts, saying that the initial concept came from Mr. Zerjav to create the corporation. According to Mr. DeMauro, Mr. Zerjav advised that Source Concepts would be listed in journal entries as marketing. "Other than receiving - - other than Source Concepts billing Power Source and Power Source sending money to Source Concepts, they did nothing." The billing was for $50,000.00 annually, which was deducted on Power Source's return. He testified that it was supposed to be for services rendered to Power Source, but no services were received. Tiger "showed us how to do the journal entries and how to do the billing." (Trial Tr. Vol.I P.155 L.24-P.157 L.12). The DeMauros were audited for the years 2003-2005. He testified that Mr. Zerjav removed some material from his

---

[2]At this time, the Court permitted the Government to offer testimony of witnesses Demauro and McNeill out of turn.

records and advised him that Source Concepts was not being audited, that the Internal Revenue Service had no knowledge of Source Concepts and "we should not bring up Source Concepts at all." (Trial Tr. Vol.I P.158 L.10-11, P.159 L.4-22). He testified that Mr. Zerjav "arranged that we lease back a car, that we own our car personally and the company lease the car back." (Trial Tr. Vol.I P.161 L.17-24). He stated that he was advised by Mr. Zerjav that deductions could be taken on the Power Group return, a corporation operated from their house, for life insurance, lawn care and trash pick-up. His wife, who owned Power Group, performed services for that corporation from their home. When the switch was made from sole proprietorship to S-corporation, Mr. DeMauro's salary was reduced from $30,000.00 to $24,000.00 back to "like $12,000.00 a year, to save on F.I.C.A. taxes." (Trial Tr. Vol.I P.162 L.10-P.164 L.2).

Mr. Zerjav advised them that meal expenses for employees "were allotted at a 50 percent rate." Mr. DeMauro testified that meals "were changed from meals to a different classification and 100 percent of that was deducted." (Trial Tr. Vol.I P.164 L.12-15, P.164 L.23-P.165 L.4). He testified that Mr. Zerjav told them that when their daughters entered college, if they worked for the business, $5,280 could be deducted for tuition each year. This deduction was claimed when the daughters went to college, on returns prepared by Mr. Zerjav. (Trial Tr. Vol.I P.165 L.9-P.166 L.5). On cross-examination, Mr. DeMauro testified that his daughters did, in fact, work for the business, performing real services that were beneficial to the business. (Trial Tr. Vol.I P.17 L.3-17). As for the deductions related to business activities related to the DeMauro home, Mr. DeMauro acknowledged that the business was, in fact, operated from the home. He testified that the expenses were related to the business use of their home where business activities were conducted. (Trial Tr. Vol.I P.177 L.18-P.178 L.3).

On further cross-examination, Mr. DeMauro admitted that he lied to the Internal Revenue Service Agent, Laura Vidal, by telling her that they did not own Source Concepts. He admits that Mr. Zerjav did not tell him to lie about Source Concepts. He also admitted when he made the statement to Ms. Vidal, neither Mr. Zerjav or Tiger were present. (Trial Tr. Vol.I P.178 L.17-P.179 L.25). He also admitted that he understood the affidavit he signed "had to be submitted as part of a resolution of [his] problems with the IRS." (Trial Tr. Vol.I P.181 L.2-16).

It turns out that there was a recording of the initial meeting at the Internal Revenue Service office, and that Mr. DeMauro's answers concerning his knowledge of and the viability of Source Concepts at that meeting and his sworn testimony in this hearing have no common element! In the initial interview by the IRS, Agent Laura Vidal asked Mr. DeMauro "[w]ho is the main person who does the promotional work?" Referring to that question, Defense Counsel Mr. Bruntrager asked Mr. DeMauro, "[i]f you look at the context, we're clearly talking about Source Concepts, right?" Mr. DeMauro answered, "[y]es." Then, Mr. Bruntrager read from the initial interview the following line of questions from Ms. Vidal: "Who pays the expenses? Who handles the promotions, writing the checks, any type, knowing how to market? Who does that? Do you?" In the interview, Mr. DeMauro answered, "I do a lot of it." Then, Mr. Bruntrager asked again, "[y]ou were talking about Source Concepts, right?" Mr. DeMauro unconvincingly answered, "No. I was talking about Power Source." Mr. Bruntrager came back, "[b]ut she said Source Concepts, didn't she? Look at that document." Mr. DeMauro responded, "Source Concepts and Power Source were the same entity as far as I was concerned." Later, Mr. Bruntrager asked Mr. DeMauro, "[d]id you lie to her there?" Mr. DeMauro testified, "I don't think I lied. I don't think I was 100 percent truthful." The Court concludes that Mr. DeMauro

gave untruthful testimony before the Court.  It is patently apparent that Mr. DeMauro is willing to say whatever he thinks will help him with the Internal Revenue Service, irrespective of the consequences to Defendants.  Mr. DeMauro was a much better witness for Defendants than for the Government.  (Tr. Vol.I P.182 L.14-P.184 L.13) (Defendant's Exhibit 52).

The Government next called Allen McNeill who makes "promotional doughnut boxes and other food-safe packaging."  He owns Jubilee Promotional Company, a Missouri incorporated business.  (Tr. Vol.I P.191 L.1-16).  Zerjav & Company prepared income tax returns for Allen McNeill for 2004, 2005 and 2006.  (Gov't Ex. No.8, 9 and 10).  Mr. Zerjav recommended that Mr. McNeill create two legal entities, a C-corporation called Colonsay Corporation and MCM Trust, which was based on the name of his daughter, Michelle Christine McNeill.  Colonsay provided services for Jubilee Promotional Company, addressed at the McNeill home.  Its employees were Mr. McNeill, his wife, their three children and two children who were friends of his children.  MCM Trust held assets that were transferred from Jubilee Promotional Company, so the Trust could lease the assets back to Jubilee Promotional Company.  The assets were transferred to the trust as a gift from Mr. McNeill and his wife, each of whom could give $11,000.00 annually, tax free.  This was arranged with considerations that Mr. McNeill was in a higher tax bracket than his daughter, "so the income would then be shifted from a higher tax bracket to a lower tax bracket.  The value of the assets was slightly more than $37,000.00.  Jubilee Promotional Company then paid $1,858.00 monthly to the trust. (Tr. Vol.I P.193 L.7-P.194 L.13; P.195 L.22-P.196 L.10; P.197 L.2-17).  The total amount of lease payments made to MCM Trust was $90,000.00.  This amount was chosen by Mr. Zerjav and Mr. McNeill.  Mr. McNeill's tax returns for 2004, 2005 and 2006 were audited by the Internal Revenue Service, and

Mr. McNeill "had to pay additional taxes and penalties," according to Mr. McNeill. The Internal Revenue Service Agent, Rebecca Palm, told Mr. McNeill that the arrangement was a sham to reduce his salary and transfer it to his daughter in a lower tax bracket. (Tr. Vol.I P.200 L.9-21; P.203 L.17-22).[3]

On cross examination, Mr. McNeill testified that Mr. Zerjav never told him he could create a staffing company "and just pay people for not working." He knew they had to work. When asked, "So Mr. Zerjav did not tell you you could create a staffing company and just pay people for not working, did he?" Mr. McNeill answered, "[n]o." He remained steadfast that the conversation with Mr. Zerjav "didn't have to do with who was doing what[,]" but he admitted that there were services provided by his children, his children's friends and his wife. (Trial Tr. Vol.II P.225 L.3-15, L.24-P.226 L.22). Mr. McNeill admitted that the creation of the legal entities was discussed with two attorneys recommended by Mr. Zerjav. (Tr. Vol.II P.228 L.3-P.229 L.4).

The audit of his returns was concluded with the following required adjustments: those related to Colonsay and the MCM Trust; "there might have been an adjustment for entertainment . . ."; a substantial adjustment related to a loan between himself and Jubilee Promotional Company (the Internal Revenue Service took the position that he or Jubilee had deducted as interest what should be recategorized as wages); and an adjustment based on how he treated legal fees related to the acquisition of a patent (i.e., whether the legal fees should be expensed or capitalized). (Tr. Vol.II P.235 L.1-22). Mr. McNeill testified that he did not remember that the Internal Revenue Service proposed a 6662 penalty (a negligence penalty) against him and his wife with respect to

---

[3]At this time, the Court recessed to an agreed date.

the adjustments on his tax returns.  However, when confronted with a copy of a two and one-half page letter he wrote to the Internal Revenue Service dated December 6, 2007, explaining why he had not been negligent, he testified, "[o]h.  Yes I did."  He then recalled, "something like that" when asked if the Internal Revenue Service Agent suggested he was a sophisticated taxpayer that should have been more careful.  (Trial Tr. Vol.II P.235 L.23-P.236 L.14).

Mr. McNeill's memory was again faulty when asked if he had inquired of the Internal Revenue Service "if they could help [him] with a claim [he] might have against Mr. Zerjav."  He testified, "I don't recall that." (Trial Tr. Vol.II P.236 L.23-P.237 L.5).  He was then shown some entries from the Internal Revenue Service audit, one of which stated, "Allen asked about  - - asked what Frank's responsibility is in all of this as he had paid Frank a lot of money for his advice . . . ."  When asked if that refreshed his recollection he testified, "I just don't recall." (Trial Tr. Vol.II P.238 L.8-23).  When asked if he had told Internal Revenue Service Agent Essner (now Palm) that he would be happy to be a witness for the Internal Revenue Service against Mr. Zerjav, Mr. Allen testified, "I don't recall that I said I would be happy."  Upon further questioning as to whether he inquired if the Internal Revenue Service needed a witness, he said, "I don't recall that either." (Trial Tr. Vol.II P.239 L.1-8).  When shown another document which reported, "[h]e asked if the Government was in need of a witnesses," and whether that refreshed his recollection, he testified, "I suppose if that's documented, then I suppose it happened.  I - - don't recall." (Trial Tr. Vol.II P.239 L.18-25).   He admitted that he had not been subpoenaed, but came at the request of the Government.  (Trial Tr. Vol.II P.240 L.4-10).  Mr. Allen McNeill is not a believable witness.

Internal Revenue Service Agent Dianna Beers was recalled from being excused in order to accommodate other witnesses being called out of turn. She audited the tax returns of Ryan and Jill Laux, taxpayers who worked as a real estate agent and for a local television station, respectively. Ms. Beers testified that in 2004, Mr. Zerjav created an S-corporation for Mr. Laux's real estate transactions. (Trial Tr. Vol.II P.242 L.3-14, P.243 L.2-12). Mr. Laux participated in the Advisory Group coaching program at Zerjav & Company fo which he paid a $2,500.00 fee. (Trial Tr. Vol.II P.264 L.25-P.265 L.6).

Ms. Beers disallowed a number of deductions on the Laux returns. Government's Exhibit 12 is her audit report for the Laux tax return filings for 2004, 2005 and 2006. She referred to Government's Exhibit 42 as a demonstrative exhibit in identifying some of the disallowed deductions. (Trial Tr. Vol.II P.274 L.14-23; P.277 L.4-7). She explained that the Lauxes had attempted to deduct health insurance payments, which had been deducted on a pre-tax basis, and she testified, "[w]hen health insurance is deducted on a pre-tax basis, you cannot then take that deduction again somewhere else on the tax return because you have already received relief from tax by having it deducted before you ever get your paycheck." (Trial Tr. Vol.II P.283 L.13-25). The Lauxes' claim for deduction of all medical expenses was also disallowed. (Trial Tr. Vol.II P.284 L.8-20). Mr. Laux said that he had been instructed by "either Frank or Tiger that he was allowed to take those deductions." (Trial Tr. Vol.II P.285 L.9-14). On the S-corporation return, deductions for travel were claimed. (Trial Tr. Vol.II P.285 L.21-P.286 L.1). Mr. Laux's personal travel was disallowed, but his business travel was allowed. (Trial Tr. Vol.II P.286 L.8-13). A claim for parking was also disallowed. She explained that parking for business purposes is deductible as a business expense, but Mrs. Laux's "parking that she paid when she went back and

forth to work every day" was disallowed. (Trial Tr. Vol.II P.287 L.2-19). Finally, there were disallowed deductions on the Laux S-corporation returns for personal landscaping, internet and cable claims. Ms. Beers testified that during the coaching session, Tiger told Mr. Laux that he was allowed to take those deductions. "He was told he could take 35 percent of his landscaping, excluding lawn care. The landscaping deduction appeared on the depreciation schedule." (Trial Tr. Vol.II P.287 L.24-P.289 L.12).

Ms. Beers audited the 2005 return of Michael and Dawn Woijeck prepared by Mr. Zerjav, and she prepared an audit report. (Trial Tr. Vol.II P.293 L.10-21) (Gov't Ex. No.13 and No.35). Mr. Woijeck operated a business called Freedom Title as a partnership. She testified that Mr. Zerjav advised him to create an S-corporate entity. She testified that the tax code is written so that "if you have an S-corporation, you're not subject to self-employment tax because the assumption is that as an owner or a shareholder in an S-corporation, you're going to receive a wage. And so you will be taxed on your wages the same as you and I as employees would be taxed." (Trial Tr. Vol.II P.300 L.6-P.301 L.3). She testified that based on her interview with Mr. Woijeck, he transferred his interest in Freedom Title to the S-corporation (MJD) on advice of Mr. Zerjav. Mrs. Woijeck became the owner and 100 percent shareholder of MJD, although she had no job with the company, never worked for the company, had no business with the company and all earnings went to Mr. Woijeck. She purchased an SUV for personal use and it was written off through the S-corporation. Ms. Beers determined that the S-corporation was created as a "sham entity; [used] to run additional deductions through . . . to avoid self-employment tax." She testified that Mr. Zerjav told Mr. Woijeck that if he set up the S-corporation, he could avoid self-employment tax. (Trial Tr. Vol.II P.303 L.7-15; P.304 L.1-11; P.304 L.18-P.305 L.7).

Ms. Beers performed an audit of the returns of Robert and Patricia Stewart for 2005 and 2006. She remembers them because they were unrepresented and started crying when she informed them of their post-audit tax liability. (Trial Tr. Vol.II P.306 L.21-P.307 L.17) (Gov't Ex. No.17) (Gov't Ex. No.43). Mr. Stewart is a stay-at-home dad and Mrs. Stewart is a beautician and independent business owner, who started business as a sole-proprietorship. "Crossfire L.L.C., was created by [Mr. Zerjav] as an [S]-corporation." (Trial Tr. Vol.II P.308 L.11-20). Disallowed deductions for the Stewarts consisted of personal auto expenses claimed on the S-corporation return prepared by Mr. Zerjav. (Trial Tr. Vol.II P.311 L.9-17). One hundred percent of mileage was deducted, and a majority of Mrs. Stewart's mileage was commuting mileage. None of Mr. Stewart's mileage was allowed because "he had nothing to do with the business." (Trial Tr. Vol.II P.312 L.9-19). "[T]hey stated that they had been told by Frank Zerjav that they could deduct one hundred percent of their auto expenses as business." (Trial Tr. Vol.II P.312 L.24-P.313 L.1). There is not an explanation as to whether Mr. Zerjav told them that the auto needed to be used 100 percent in the business in order to qualify for a 100 percent deduction. Ms. Beers also disallowed the claim for deduction for use of a home office since no business was conducted in the home. (Trial Tr. Vol.II P.313 L.16-P.314 L.6). The claim for meals and entertainment was disallowed because the claim was for family meals that were eaten out. (Trial Tr. Vol.II P.314 L.7-16). The Stewarts said that they had received the advice that they could write off their family meals from Mr. Zerjav. (Trial Tr. Vol.II P.314 L.22-25). Cell phone expense for phones for Mr. Stewart and their children were also disallowed because he and the children were not in the hair-cutting business. According to Ms. Beers, the Stewarts were told by Mr. Zerjav that they could make these deductions. (Trial Tr. Vol.II P.315 L.6-16).

On cross-examination, Ms. Beers testified that when she first became involved in the "FZ Project," she knew it was a special project of the Internal Revenue Service, but she did not know that it involved Frank Zerjav. (Trial Tr. Vol.II P.324 L.6-24). In September or October 2007, during the audits, she attended group meetings with other agents working on clients whose returns had been prepared by the Zerjav firm. (Trial Tr. Vol.II P.325 L.12-23). She learned that Internal Revenue Service Agents could offer taxpayers who were former Zerjav clients and who were not represented by Mr. Zerjav, the option of filing an amended tax return and accepting a penalty for the highest tax year. Ms. Beers testified that she understood if this happened, it would save time. (Trial Tr. Vol.II P.326 L.18-P.327 L.8). She disclaimed knowing that an affidavit was required by the accepting taxpayers, but acknowledged that she had written in a memorandum that Mr. Charles, power of attorney for the Lauxes, was aware of the Internal Revenue Service offer of amended returns for all open years "and the need for an affidavit from the taxpayers pertaining to preparer." (Trial Tr. Vol.II P.330 L.24-P.335 L.4). She acknowledged that in an ordinary audit, this kind of offer is not normal. (Trial Tr. Vol.II P.331 L.24-P.332 L.1).

In the Woijeck audit, Ms. Beers explained that the Woijecks had cooperated in providing amended returns, as well as furnishing an affidavit concerning the conduct of the preparer, but this was not sufficient to grant them a waiver of imposition of penalties because "the fact that the return was prepared by Mr. Zerjav's firm and the S-corporation was set up by Mr. Zerjav's firm was reasonable cause that the taxpayer did, in fact, rely on the preparer." She confesses that this judgment was made without knowing what the preparer would say, because she "was not allowed to contact either Mr. Zerjav or any preparer without a power of attorney." (Trial Tr. Vol.III P.545 L.23-P.546 L.19). No penalties were assessed against the Woijecks.

Ms. Beers acknowledged that she is aware that business deductions or nonbusiness deductions could be taken on any type of business return. (Trial Tr. Vol.III P.548 L.12-18). She said she has no way of knowing how any particular expense got booked in the first place or got reviewed at the Zerjav firm or got substantiated, and she has no way of knowing as to any particular deduction, whether it was the taxpayer's fault or the return preparer's fault that an erroneous deduction was taken. (Trial Tr. Vol.III P.548 L.18-P.549 L.5) (Def. Ex. No.60).

It has not been stated that there was in place in this investigation of the Zerjav firm, any presumption of non-compliance with Internal Revenue Service rules, any presumption of violation of any laws, or any presumption of fraud, and it may be that there was such a mechanism in place, offered to the Zerjavs for their cooperation, which they rejected. In any event, based on the evidence presented, it becomes increasingly obvious that many witnesses presented against the Defendants have grudges to settle, have incomplete information, have personal interests to protect, or have other factors in their background which make them inherently unreliable. An opportunity, before a reasonably unbiased person, for the Defendants to explain many of the complaints against them would likely have saved a lot of resources and resulted in a different approach to this investigation.

Concerning the returns of Robert and Patricia Stewart, Ms. Beers reported that the Zerjav firm had prepared their returns since the early 90's. (Trial Tr. Vol.III P.550 L.21-P.551 L.25). Ms. Beers made notes of the Stewart interview (Def. Ex. No.61) and prepared a memorandum after the interview. (Def. Ex. No.62). She recorded nothing in her interview notes dated December 3, 2007, about advice the Stewarts received from the Zerjav firm "about tax return preparation, record keeping or deductions," but stated in her memorandum dated January 7, 2008

"that all automobile expenses were a hundred percent deductible, and they were told to make automobile payments from the business account." (Trial Tr. Vol.III P.554 L.13-P.555 L.6). Her practice is to type the memorandum the same day as the interview, and she believes she was relying on her recollection when she prepared this memorandum. She did note, in her memorandum, that there is no reference to advice from anyone with respect to two automobiles used in business. In her memorandum, she wrote that the Stewarts told her that the advice they received was that the automobiles were 100 percent business use. She admitted that when she asked them in the interview how many cars they use for business, they said "both." She next asked them "[h]ow many personal miles are put on the business automobiles per week?", and she recorded a question mark for a response, meaning "they didn't know." That was translated in the memorandum to, "[t]hey stated that they were told by Mr. Zerjav that if the vehicle was a hundred percent business, they didn't need to keep those types of records." (Trial Tr. Vol.III P.555 L.12-14; P.556 L10-13; P.557 L.8-P.559 L.1).

Ms. Beers' records reflect that the Stewarts did not have a lot of communication with the Zerjav firm about their tax return. (Trial Tr. Vol.III P.562 L.10-15). She concluded, in determining that the Stewarts had made unsubstantiated deductions on their return, "[o]n advice of their preparer, taxpayers had included numerous personal expenses as business expenses on the 1120s, resulting in a reduced taxable flow-through income. Expenses erroneously classified as business included cable TV, all auto expenses, medical expenses and meals." She testified that there is nothing in her notes or her interview memorandum that discusses any advice given to the taxpayers about cable TV, medical expenses or meals. (Trial Tr. Vol.III P.564 L.11-17). She was reminded that there is also nothing in her interview notes about advice received from the

Zerjavs, and she was asked when it was that the Stewarts gave her the information about the advice from Mr. Zerjav. She testified that it was "[d]uring the time I was working with them on doing the audit, on completing the exam." She said, "[n]ot everything happens during the first time that you meet with the taxpayers." When asked how many times she met with the taxpayers, she could not recall, but stated it should be in the activity log, "and there would also be phone calls back and forth. . . ." (Def. Ex. No.63). Ms. Beers' activity log was then presented to her for her review. Her first meeting with the Stewarts occurred on December 3, 2007. She was asked, "[a]nd then if you go to the next page, it's all over by January 7th, isn't it?" She answered, "[c]orrect." When asked about these meetings and phone calls she had, when earlier she testified they would be in her activity log, she testified, "[a]pparently[,] they are not on my activity log." She admitted in her testimony that she did not make another trip to the Stewart house, that the Stewarts did not come to her office for another meeting, and if she had telephone contact with the Stewarts, she was supposed to make a record of that contact. (Trial Tr. Vol.III P.564 L.18-P.567 L.21).

When the power of the United States Government is brought against a citizen, the Courts were fashioned by the Founding Fathers to assure that the rights of the people would be protected from unrestrained intrusion into the lives of the people, the Government was instituted to serve. Here, there is mounting evidence that that awesome power may have been abused.

Ms. Beers recognized that when a taxpayer is audited, she has experienced taxpayers say "[h]ey, it wasn't me; I relied on the advice of my preparer." (Trial Tr. Vol.III P.574 L.16-23). She has seen the FZ (Frank Zerjav) Project Report (Government's Exhibit 1). Page 8 of the FZ Project Report states, "[g]enerally, a taxpayer's first line of defense or reasonable cause is to

blame the preparer."  (Trial Tr. Vol.III P.574 L.24-P.575 L.14).  Ms. Beers did not necessarily

agree with that statement.  When the taxpayer blames the preparer, she inquires of the taxpayer

how it was determined that it was the fault of the preparer, but she has never sought the

opportunity to talk to the preparer to see what they would have to tell her.  She is familiar with

*Circular* 230, which applies to enrolled preparers and recognized that it states that if preparers are

contacted and apprized that the agent needs information, they must respond with the information.

She testified that she did not examine the manual regarding mandatory contact with preparers, and

when asked, "[a]s you sit here today, you haven't looked or haven't checked to see whether or

not you have any files in that regard?, she answered "[n]o."  (Trial Tr. Vol.III P.575 L.16-P.577

L.25).  She believes that in regard to the FZ Project, she was told not to have contact with the

preparer if it was Mr. Zerjav or Tiger.  (Trial Tr. Vol.III P.578 L.8-11).

     Ms. Beers was interrogated as to whether the "deal" the Government offered to taxpayers

with Zerjav-prepared returns required them to submit an affidavit concerning Zerjav advice.  She

testified that she did not recall asking Mr. Charles, who represented some of the taxpayers with

Zerjav-prepared returns that were audited, for an affidavit from the taxpayers.  She was advised

that Mr. Charles testified that "[t]he provisions of the offer were that the taxpayer would provide

amended returns, an affidavit, and would pay penalties on the year of the greatest deficiency."

Ms. Beers testified that it was her understanding that supplying the affidavit was an option, and

that "[i]t was never a requirement."  However, her interview memorandum for Mr. Laux (Def.

Ex. No.52) recites "the need for an affidavit."  She said, "[t]hat is my words that I wrote."  (Trial

Tr. Vol.III P.581 L.10-P.583 L.21).

The Government next called Internal Revenue Service Agent Susan Cantrell, a certified pubic accountant, who is a Group Manager in Springfield, Missouri. (Trial Tr. Vol.III P.598 L.10-P.599 L.4). Ms. Cantrell audited "14 or 13" different Zerjav tax returns, encompassing four sets of individuals, Howard and Kathy Schrock; Mr. and Mrs. Keck; Charles and Laura Davis; and J.B. and Susie Andrews. (Trial Tr. Vol.III P.599 L.12-P.600 L.11). Ms. Cantrell testified that she is familiar with the "FZ Job Audit Aid," a booklet that was provided as a resource guide to use during the pre-audit or during the examination as a reference tool. She audited the returns for J.B. and Susie Andrews for the calendar years 2004 and 2005, with the following related entities: Yellowbrick Technologies, a subchapter S-corporation owned by Suzie Andrews, and JBA Staffing, a single member LLC that reported as a Schedule C sole proprietorship on the 1040. (Trial Tr. Vol.III P.605 L.5-24). Ms. Cantrell conducted tape-recorded interviews at the beginning of May 2007, first for Yellowbrick Technologies, and then for the individual tax return. The interviews were conducted with J.B. Andrews and Susie Andrews at the Zerjav office, with Mr. Zerjav in attendance. Issues focused upon initially were 1040 gross receipts and wages on Schedule C, contribution on Schedule A, and Schedule E, which included flow-through items or rental property items. (Trial Tr. Vol.III P.606 L.23-P.607 L.23). Ms. Cantrell returned to Mr. Zerjav's office subsequently to review requested records. She thereafter prepared an initial audit report in November 2007, and a revised audit report in January 2008. (Trial Tr. Vol.III P.608 L.1-P.608 L.19) (Gov't Ex. No.14).

Mr. Andrews was a marine insurance broker and Mrs. Andrews was in training and development for Stark and Associates, which paid Yellowbrick Technologies for the services of Mrs. Andrews. Ms. Cantrell disallowed deductions claimed by the Andrews. (Trial Tr. Vol.III

P.612 L.4-25) (Gov't Ex. No.34).  Ms. Cantrell testified that the entire amount paid to

Yellowbrick Technologies was for work of Suzie Andrews, "[y]et she only received for the work

that she did, 50 or 60 hours a week, for $9,000 on 2004 and $10,000 in 2005."  She testified that

"this would be unrealistic." (Trial Tr. Vol.III P.615 L.4-12).  Ms. Cantrell testified that Mrs.

Andrews had reported to her that she worked 50 to 60 hours a week for $9000 for the year.  In

addition, the amount of $847.00 was paid monthly to Suzie Andrews for the lease of her personal

vehicle.  While Mrs. Andrews did turn in a summary of miles driven each month to Yellowbrick

Technologies, "there wasn't a provision for leasing the vehicle from her.  She did not report lease

income on her individual tax return."  Ms. Cantrell testified that rental income is includable in

taxable income.  (Trial Tr. Vol.III P.618 L.4-8; L.18-P.619 L.12).  Additionally, "Rent of Home,"

for business use of her home, was paid to Suzie Andrews at the rate of $496.00 monthly or

$5,952.00 per year.  Ms. Cantrell determined that this amount did not meet the qualifications

required in the Code for a deduction. The Andrews did not report rental income on their

individual tax return.  (Trial Tr. Vol.III P.619 L.15-P.620 L.119).

   The next issue with the Andrews was the one member LLC, JBA Staffing, in the name of

J. Andrews.  Money was paid to JBA Staffing and J. Andrews from Yellowbrick Technologies for

staffing and support, based on hours that they recorded that their 10-year old son performed.

This income was reported on Schedule C of the individual income tax return.  Then, Mr. Andrews

paid their dependent son a lesser amount out of this.  Ms. Cantrell determined that JBA Staffing

was a sham entity created for the business purpose of getting money out of the 1120S.  The work

the Andrews reported as performed by their then 10-year old son for Yellowbrick Technologies

was "marketing research, preparing PowerPoint slides and callbacks for customers."  Ms. Cantrell

testified that the supplied documentation for activities seemed suspect. (Trial Tr. Vol.III P.620 L.22-P.622 L.19).

Ms. Cantrell next observed that the Andrews were leasing personal equipment inappropriately. CCA Trust, in the name of the Andrews' daughter, received $37,192 in 2004, and $34,278 in 2005 for rent "on equipment." When Ms. Cantrell requested an opportunity to observe the equipment in the Andrews home, she discovered that the claimed equipment consisted of a conference table and chairs, admittedly used by the Andrews family as the same table and chairs for taking of their daily meals, a desk and chair, which was a table and chair or two, credenza-type cabinets, and a computer on the desk. When Ms. Cantrell inquired of Mrs. Andrews how the Trust came to own those items, she responded, "ask Mr. Zerjav." (Trial Tr. Vol.III P.623 L.1-P.624 L.20). Ms. Cantrell concluded that the furniture, including their dining room table and chairs, was personal equipment and not a business asset, and that the amounts paid were quite excessive. (Trial Tr. Vol.III P.624 L.21-P.625 L.12). Additionally, the Andrews had taken IRC deductions (an election to deduct the entire amount rather than list it as a depreciation item) on a television and couch in their home. She determined these were personal items. Mrs. Andrews confirmed that these were used as personal items. An IRC deduction is only permitted for business expenses. (Trial Tr. Vol.III P.625 L.13-P.626 L.12).

Ms. Cantrell testified that she was told by Dan Hathcock at Zerjav & Company that the QuickBook entries were all done by Zerjav & Company.[4] (Trial Tr. Vol.III P.628 L.12-16).

[4]The Court notes that this is hearsay, and a protracted record was made that hearsay evidence would be received at this preliminary injunction hearing, with weight to be determined by the Court. The Court observes, that this statement, attributed to Mr. Hathcock, is inconsistent with all of the other evidence, that QuickBook software was purchased by the clients, independently from Zerjav & Company, and used by Zerjav & Company clients as a gathering

Penalties were waived in this case because Mr. Charles, the Andrews' attorney, said that the Andrews went through the coaching sessions, followed the coaching sessions to a "T," and that everything they did on their tax return was at the direction of Zerjav & Company. Ms. Cantrell concluded that, based on provided documentation, there was reasonable cause to believe that the errors were made because they relied on Zerjav & Company. (Trial Tr. Vol.III P.629 L.19-P.631 L.8).

On cross-examination, Ms. Cantrell testified that she had never heard the term "settlement offer," and she was not aware that any taxpayer was required or requested to provide any affidavits. (Trial Tr. Vol.IV P.652 L.10-P.653 L.19). She said that the Andrews reported to her at the interview that they worked with a lot of people at Zerjav & Company; Suzie Andrews stating that they had a lot of good information on how to keep records when they first started working with Mr. Zerjav (she never worked with Tiger). When asked, "[w]hen you say she said she had a lot of good information, you mean she was provided instructions by Mister - - was it Mr. Zerjav or somebody else in the Zerjav firm?" She answered, "[s]he - - She didn't say exactly who." (Trial Tr. Vol.IV P.657 L.8-22). Ms. Cantrell prepared a typed printout of information she received during the interview. (Trial Tr. Vol.IV P.659 L.8-10) (Def. Ex. No.65). She conducted two interviews on the same date, one for the individual return and one for the 1120S (the S-corporation). (Trial Tr. Vol.IV P.659 L.16-25). She testified that she asked the Andrews if, when they dropped off their records, they would "talk to the person who would prepare [their] return and [if they] would know who the preparer is at the time." In the interview, the answer of the Andrews, as recorded by Ms. Cantrell, was "yes." The next question was, "[y]ou don't

---

device with entries made by the taxpayers.

actually talk to Mr. Zerjav." The Andrews' answer was "[n]o." Mrs. Andrews said that they had

the same person, Mike Montana, at Zerjav & Company, over a couple of years. However, there

seems to be some conflict as to whether Mike Montana prepared the returns, or if he was just a

"contact," or whether Barry O'Gorman was the preparer, or if he was another "contact." (Trial

Tr. Vol.IV P.660 L.19-P.662 L.15). Ms. Cantrell testified that Mr. Zerjav signs every tax return

and reviews certain ones. (Trial Tr. Vol.IV P.662 L.16-25).

Ms. Cantrell reviewed the Internal Revenue Service file respecting the Andrews

(Defendants' Ex. No.66), provided during the "managerial conference" by the Andrews' attorney,

Maureen Miller, "as an indication [the Andrews] were arguing penalties," and "to show that she

had received this information from the Advisory Group." The notation across the top of the file

said "JBA Staffing," which is the entity employing the ten-year old son, and a portion of the

document states, "[s]ave big tax dollars; hire your dependent children." She testified her

recollection was that they were indicating how they could keep records and what jobs children

might do, and that "yes. I looked at this. And I see it's supposed to be reasonable compensation.

So I believe it further backed up the adjustment that I made." When she was reminded that she

hadn't answered the question asked, and that the question was, "[d]oes this comport with your

understanding of what the tax law requires?, Ms. Cantrell answered "[y]es." (Trial Tr. Vol.IV

P.663 L.25-P.666 L.24). The Andrews described in detail the work their son was doing, and at

the interview, there was no discussion between Ms. Cantrell and the Andrews about the

reasonableness of the hourly rate. (Trial Tr. Vol.IV P.667 L.16-P.668 L.7).

Perhaps the biggest issue in the Andrews' audit was Ms. Cantrell's belief that Mrs.

Andrews took an unreasonably low salary from Yellowbrick Technologies to avoid paying

employment tax. This evidence was adduced, the Court believes, to convince the Court that Mr. Zerjav was ultimately responsible for advising the Andrews to take a low salary to reduce taxes. On cross-examination, it was disclosed that not only is there no evidence that Mr. Zerjav or anyone at Zerjav & Company advised Mrs. Andrews to take an unreasonably low salary from Yellowbrick Technologies, but, in fact, Ms. Cantrell was aware that Mr. Zerjav recommended that Mrs. Andrews take a higher salary. In a letter to Mrs. Andrews from Mr. Zerjav, he recommended monthly salary payments to Mrs. Andrews, specifically stating, "[b]eginning in January, 2004, $2,000." Ms. Cantrell was asked, "it recommends that beginning in January, 2004, Miss Andrews draw a salary of $2,000 a month?" She answered, "[t]hat's what the letter says." Mrs. Andrews claimed $9,000 for salary in 2004, rejecting Mr. Zerjav's recommendation that she draw at least $24,000.00 for 2004. The 2006 letter from Mr. Zerjav recommends the same amount and also specifically says, "[t]he salary level intends for the Corporation to be in compliance regarding compensation for functions by you as an employee/officer." (Trial Tr. Vol.IV P.669 L.6-P.671 L.9).

The equipment leasing trust (CCA Trust) was established by an attorney, not Zerjav & Company. (Trial Tr. Vol.IV P.675 L.25-P.676 L.20). Ms. Cantrell agreed that the invoice for the television, claimed as a business deduction, bore writing that said, "TV and set-up for training," and she acknowledged that if this was given to the Zerjav firm "it would be a representation by the taxpayer to the preparer that this is equipment purchased by the Company for its business purpose." (Trial Tr. Vol.IV P.680 L.11-P.681 L.12) (Def. Ex. No.70).

Ms. Cantrell had a meeting with Mr. Harry Charles and Ms. Maureen Miller, attorneys for the Andrews, concerning whether the negligence penalty should be imposed against the Andrews.

(Trial Tr. Vol.IV P.685 L.23-P.686 L.24). Ms. Cantrell agreed that with respect to avoidance of the negligence penalty, a taxpayer who has understated his tax liability is trying to show that it is not his fault, rather it is someone else's fault, and usually the someone else is the person who prepared the tax return. When asked if at the closing meeting Mr. Charles and Ms. Miller were trying to convince her that she should not assess a penalty against the clients because they relied on the Zerjavs, Ms. Cantrell responded, "[y]es." (Trial Tr. Vol.IV P.687 L.23-P.18). Ms. Cantrell recognized that she knew on January 12, 2008, that the Andrews filed a lawsuit against "Zerjav." (Trial Tr. Vol.IV P.694 L.4-7). Ms. Cantrell believed that the negligence penalty should have been imposed on the Andrews, but her manager waived the penalty. (Trial Tr. Vol.IV P.695 L.15-24).

As the Andrews' audit was concluding, it was noted on the Penalty Approval Form that "additional documentation provided supports that the taxpayers relied completely on the preparer." It goes on, "[a]ll adjustments to preparer and no fault to taxpayers." Ms. Cantrell admitted that this conclusion was made without ever speaking to people who had information about these matters because "[t]hey didn't have the Power of Attorney." (Trial Tr. Vol.IV P.705 L.15-P.706 L.21). Ms. Cantrell was asked whether she ever went outside to talk to the preparer in cases where someone said they relied on a tax preparer no longer involved in the audit. She said, "I don't remember ever doing that, no." She said that she makes her decision based on the information "that I get in an examination. And if - - And I wouldn't go back and try to get more information once I've determined that they relied on the preparer." When asked if she was trying to hold the preparer responsible, she said, "I don't know. I wasn't - - I didn't do that." (Trial Tr. Vol.IV P.710 L.9-25).

This is another example of how misleading the Government's evidence is as presented, before it is subjected to effective cross-examination. Evidence was proffered to convince the Court that Mr. Zerjav instructed taxpayers to have their children receive exorbitant sums for work beyond their age level, when the evidence is that Zerjav & Company presented information that, as confirmed by Ms. Cantrell, was legitimate instruction under the law. In fact, Mr. Zerjav never provided information to the Andrews suggesting that they should ever seek unreasonable deductions for children's services. The Court, with presentation of evidence concerning each taxpayer, becomes more convinced that the complicity and responsibility for claiming unreasonable deductions lies with individual taxpayers. It is clear, beyond any question, that all of these taxpayers were claiming unreasonable deductions, and were curiously excused in the quest to shut down Zerjav & Company. As noted above, Ms. Cantrell recommended that the negligence penalty should be assessed against the taxpayers, and her recommendation was rejected by a superior. A strong case has been made against these taxpayers for tax deficiency and penalties. It appears to the Court, to this point, that the focus of this extensive investigation has been misdirected.

Rebecca Palm, Internal Revenue Service Agent, has Bachelor's and Master's Degrees in accounting and has served as an on-the-job instructor and as Acting Group Manager. She is familiar with the FZ Project and has audited twenty-nine returns prepared by Mr. Zerjav and Tiger. (Trial Tr. Vol.IV P.766 L.1-P.767 L.23). She audited the returns of George and Claudia Viamontes for 2004, 2005 and 2006. Mr. Viamontes was treated by Ms. Palm as a Real Estate Professional, an appellation that makes some difference in the auditing process. (Trial Tr. Vol.IV P.770 L.11-19; P.781 L.13-15). An issue arose in his audit that related to a like-kind exchange,

treatment that allows a gain to be deferred. Another issue identified was duplicate losses, specifically that the Viamontes had losses in 2004 and 2005 which were reported as passive loss carryovers, "when, in fact, they had already been taken in prior years." (Trial Tr. Vol.IV P.771 L.10-21; P.772 L.6-11). Ms. Palm also audited the returns of related businesses, Mid-County Real Estate and Ian's LLC, which flowed down to Mid-County Real Estate. (Trial Tr. Vol.IV P.781 L.16-22; P.784 L.2-15). She determined that the Viamontes deducted 100 percent of their share of Mid-County's loss. (Trial Tr. Vol.IV P.785 L.5-16).

Ms. Palm initially met the Viamontes at Mr. Zerjav's office in August 2007. Mr. Zerjav was present, with the Viamontes, along with Dan Hathcock. (Trial Tr. Vol.IV P.786 L.2-20). She had talked to Mr. Viamontes on the telephone before the face-to-face meeting and knew that both Mr. and Mrs. Viamontes were psychiatrists. She asked questions at the meeting to determine if there was support for claiming the "real estate professional election." To qualify for this election, the claimant must spend more than half of his or her personal services in all businesses, in real property businesses. Next, the claimant must work more than 750 hours on real estate property business or rentals. Questioning of the Viamontes revealed that they had not worked as much as one hundred hours, but claimed they had made some decisions regarding the real estate business. The final element that must be satisfied to get the benefit of this election is that the claimant must materially participate in each rental, without claiming time in a real property business. Ms. Palm concluded the Viamontes did not qualify for this deduction, and disallowed $33,000 for that claimed deduction in 2005. (Trial Tr. Vol.IV P.793 L.7-P.796 L.3).

Ms. Palm testified that Mr. Viamomtes told her that Zerjav & Company had told them that they were entitled to "'deduct these things;' in my mind, referring to, you know, the flow-through

loss that I was questioning him about. And he went on to say that Zerjav & Company told him this because they were running the company or were real estate professionals." (Trial Tr. Vol.IV P.800 L.3-10). On cross-examination, Ms. Palm was asked about the identity of the person who spoke on behalf of Zerjav & Company as to the claiming of the professional real estate deductions. She answered, "I think during the initial interview I asked [Mr. Viamomtes] some specifics, and they couldn't really recall a specific name." When asked if she knew, she said, "I don't know a specific person's name, no." (Trial Tr. Vol.IV P.809 L.22-P.810 L.5). Ms. Palm never determined the identity of the person at Zerjav & Company that prepared the returns. (Trial Tr. Vol.IV P.812 L.17-21).

The credibility problem for the Government's case continues to surface. Ms. Palm admitted that she first became involved with the FZ investigation in early 2007, and participated in meetings at that time. She was asked, "[a]nd in those meetings in early 2007, before you'd done these audits, you would have been told that the IRS intended to put the Zerjavs out of business, weren't you? She answered, "[no]." She was then reminded that her deposition had been taken on July 15, 2008, a date the Court recognizes as relatively recent to the hearing in this case. Under oath, again, she was reminded that in her deposition she was asked, '[w]ere you aware that the Internal Revenue Service intended to put Frank Zerjav and the accompanying entities out of business?" When asked if she remembered being asked that question, she replied, "[n]ot exactly." Counsel then repeated the answer she gave under oath in her deposition testimony, "I guess the answer would have to be yes because I knew of that information." When asked, from her deposition, when she first became aware "of their intent to put him out of business," she testified, '[s]pecifically [,] I don't know, but going back to the first types of meetings that we had in early

33

2007 as an introduction to this project, I know, again, there's an organization-wide preparer project. That's essentially what they're worked for, so it just kind of made sense." Ms. Palm, in answer to the question if she remembered giving that answer, she said, in Court, "[y]es." (Trial Tr. Vol.IV P.831 L.11-P.833 L.7).

Ms. Palm audited the returns of Brian and Margaret Rincker for 2005 and 2006 and investigated whether penalties should be assessed against them. She requested information from their power of attorney, Rick Wion, as to who was responsible for making changes from the original return to the amended return. (Trial Tr. Vol.V P.874 L.1-P.875 L.10). After reviewing materials supplied by the power of attorney, Ms. Palm decided not to penalize the Rinckers. (Trial Tr. Vol.V P.884 L.9-12) (Gov't Ex. No.48). Exhibit A from Government's Exhibit 48, a letter from Advisory Group, was relied upon by Ms. Palm in deciding not to assess penalties, "[b]ecause it's a specific directive coming from the Advisory Group saying, '[p]ay yourself this much.'" She also relied on transcribed notes taken by the taxpayer (Exhibit C-1), because it talks about the changes that were made on the amended return pertaining to auto lease, dues and subscriptions, insurance and officer salary. (Trial Tr. Vol.V P.884 L.23-P.885 L.11). She also relied on a letter from Mr. Zerjav in determining whether to assess penalties. The officer compensation is specifically stated effective 2006, and the amount in the letter is exactly the amount entered on the return.[5] (Trial Tr. Vol.V P.886 L.12-P.887 L.1; P.87 L.24-P.888 L.3) (Gov't Ex. No.49).

---

[5]This is the first evidence connecting Mr. Zerjav to any representations that are documented.

Ms. Palm also conducted an audit of the returns of Bryant and Mollie Hankins for taxable years 2005 and 2006, prepared by Zerjav & Company. She investigated whether to assess penalties against the Hankins. Their power of attorney was Ron Wion. Mr. Wion sent a letter to Ms. Palm (Government's Exhibit 53), to explain changes from the original return to the amended return and to identify the persons responsible for changes. (Trial Tr. Vol.V P.888 L.21-P.889 L.15-22; P.890 L.1-15). She relied on Exhibit A from Government's Exhibit 53, a document from Zerjav & Company, in determining whether to assess penalties against the Hankins, claiming that it addresses some of the items that were changed from the original to the amended returns, regarding officer compensation and rent claimed for the home office. On officer compensation, she testified that specific instructions were given in Exhibit A for a specific amount of compensation to claim per month. It specifies "[n]et salary, after deductions, is $692.62. You will need to issue monthly salary checks of $692.62 made payable to Bryant Hankins." (Trial Tr. Vol.V P.891 L.5-24). When asked,"[d]id that number have any relationship to the return you were auditing?," Ms. Palm answered, "[y]es." Then she was asked, "[h]ow so?" She answered, "[y]ou know, without reviewing the officer compensation lead sheet for 2005, I'm not sure if the amount reconciled or not. I don't remember." (Trial Tr. Vol.V P.891 L.25-P.892 L.6). When allowed to refresh her recollection by looking at Government's Exhibit 50, she testified, "[t]he amount on Exhibit A of that letter, $750 per month, does tie exactly to what was taken on their return in both 2005 and 2006." (Trial Tr. Vol.V P.893 L.5-7).

On cross-examination, Ms. Palm admitted that she did not conduct an audit of the original Zerjav & Company return. She never met Mr. and Mrs. Rincker, nor did she meet Mr. Wion, but she did talk to Mr. Wion on the phone and corresponded with him. (Trial Tr. Vol.V P.898 L.6-

16).  The issue of officer compensation arose when the Rinckers filed an amended return "and increased officer compensation on their own."  Mr. Wion provided a letter that explained that the Rinckers "thought what was on the original return was unreasonable."  Then she was asked, "[b]ut it's fair to say that you had not made a determination as to whether the amount of compensation reported on the Zerjav-prepared returns was either reasonable or unreasonable because you didn't have to go there.  The tax - - This Mr. Wion was volunteering to make a judgment for you.  Isn't that right?"  She answered, "[t]hat's right." (Trial Tr. Vol.V P.899 L.8-14).  When asked that if in a "normal" audit, she personally would have to make a judgment that adjustments should be made, she testified, "[y]es, in a normal audit."  The subsequent question was, "[a]nd then you would have to evaluate, because in every case you're supposed to evaluate, whether the penalty should be imposed, correct?"  She answered, "[r]ight."  When asked if in this case she had not made a personal decision about the reasonableness of compensation, she testified that the amended return substantially increased officer compensation.  "I would have questioned the officer comp[ensation] on the original return.  What they put on the amended return looked reasonable to me." (Trial Tr. Vol.V P.900 L.24-P.901 L.16).

When questioned on the subject of her analysis of whether to assess a penalty against the Hankins, Ms. Palm said she never contacted the Advisory Group to complete her penalty evaluation.  She testified that she understood that the Internal Revenue Service Manual was a publication prescribing rules for how revenue agents are to conduct examinations.  She did not recall if she had ever consulted the Manual with respect to the requirements when a taxpayer asserts reliance on a preparer or advisor.  (Trial Tr. Vol.V P.901 L.17-P.902 L.7; P.902 L.17-P.903 L.12).  She was shown Section 20.1.5.6.2 which states, "[w]henever the penalty is not

36

asserted because the taxpayer has met the 'advice standard' under the reasonable cause exception, contact with preparer to confirm that the advice was provided and that the standard under the reasonable cause section is available is mandatory before the case is closed for the group." When asked, "[a]re you aware that that provision exists, Miss Palm?" she replied, "[n]o, I don't recall seeing that before." (Trial Tr. Vol.V P.903 L.13-P.904 L.7) (Def. Ex. No.80). She said she had not discussed waiver of penalty with her manager, but she did discuss the procedure they were to follow with Bill Buller, the FZ Project manager. (Trial Tr. Vol.V P.904 L.8-P.905 L.1).

Ms. Palm testified that the Hankins' examination came to her in the same fashion as the Rincker case. Mr. Wion represented the Hankins. She said that she never met these taxpayers either and that the case also came to her as an amended return. (Trial Tr. Vol.V P.905 L.18-P.906 L.9). The Hankins' letter (Gov't Ex. No.53), and the Rincker's letter, upon which Ms. Palm relied in her conclusions, are similar, both stating that the "compensation recommendation" from the Zerjav firm has a "no less than" amount. Referring to Government's Exhibit 53, it states,"[p]lease note that the amount of monthly payroll is stated as 'no less than' but the Advisory Group stressed in multiple verbal 'coaching sessions' that the amount was sufficient regardless of revenue or gross profits." Since she relied on this language, she was asked how she was able to determine what was said in verbal communications between the Advisory Group and this taxpayer. She said she had no reason to doubt it. (Trial Tr. Vol.V P.906 L.10-P.907 L.20) (Gov't Ex. No.48).

Stacy Voss, a Revenue Agent and Certified Public Accountant, testified that she has been with the Internal Revenue Service for three and one-half years and has an additional six and one-half years experience as an accountant. She performed "close to 70" audits of Zerjav & Company

prepared tax returns. She knew there was a return preparer project on the Zerjav returns. As to

her approach to the audits, she said that the "audit work itself was the same[, but] there may have

been extra procedures." She testified that there may have been extra questions asked and there

could be additional reporting at the end. (Trial Tr. Vol.V P.963 L.12-P.964 L.3; P.964 L.11-

P.965 L.7).

Ms. Voss audited the returns of Mr. and Mrs. Chamberlin for 2004 and 2005. (Trial Tr.

Vol.V P.965 L.8-15) (Gov't Ex. No.22 and 39). Mr. Chamberlin is an insurance salesman and

Mrs. Chamberlin is a school teacher. Mr. Chamberlin reported his insurance sales on Schedule C

of the parties' personal return. He had a separate S-corporation and a C-corporation. (Trial Tr.

Vol.V P.970 L.22-P.971 L.5; P.971 L.11-19). Mr. Chamberlin described the S-corporation as

also receiving commissions from the insurance business and the C-corporation "was fee for

service or payment for advice." (Trial Tr. Vol.V P.972 L.23-P.973 L.1). Ms. Voss concluded

that the S-corporation "was effectively the very same as the Schedule C on the personal return,

and the activity on the C-corporation was of a different type of work." She concluded that both

"were effectively the same work." (Trial Tr. Vol.V P.973 L.22-P.974 L.4). Ms. Voss disallowed

deductions for wages paid to children. She said the Chamberlins describe the children's work as

office work and maybe one flyer made by the daughter. She testified the Chamberlins never

provided evidence of actual work performed. She did not interview the children. She asked if she

could speak to the children, and " . . . it was not offered." (Trial Tr. Vol.V P.974 L.15-P.975

L.24). She also disallowed a deduction of $5,300 for a family vacation as a business expense on

the C-corporation. (Trial Tr. Vol.V P.979 L.2-11). She testified that the Chamberlins told her

that someone from the Zerjav firm had advised them to take the deduction, but she said no name

was supplied as the preparer. (Trial Tr. Vol.V P.979 L.25-P.980 L.7). She also disallowed a deduction for "auto and local travel," because there was no record keeping for business use or personal use. (Trial Tr. Vol.V P.980 L.10-21).

Ms. Voss also audited returns for David and Kristin Kelpe for 2004, 2005 and 2006. Mr. Zerjav signed the 2004 and 2005 returns and the 2006 return was not filed. (Trial Tr. Vol.V P.981 L.5-18). Only the Zerjavs had given them tax advice for this period. (Trial Tr. Vol.V P.989 L.5-7). Mr. Kelpe was a commercial real estate agent and Mrs. Kelpe was a housewife during the years of the examination. (Trial Tr. Vol.V P.983 L.5-10; P.983 L.1-4) (Gov't Ex. No.40). Mr. Kelpe's real estate commissions were paid to his S-corporation and Mr. Kelpe paid himself a wage from that corporation, which, in Ms. Voss's judgment, was too low. She testified that "the Zerjavs had advised the wage that should be paid." (Trial Tr. Vol.V P.984 L.23-P.985 L.11). The McMillian Corporation was Kristin Kelpe's corporation, used to receive payments from Mr. Kelpe's company for services performed, such as bookkeeping. (Trial Tr. Vol.V P.985 L.12-23). The full amount of Mr. Kelpe's automobile expense was deducted on the S-corporation. Ms. Voss disallowed some "auto and local travel," but his business use was allowed. Fifty percent of meals and entertainment were disallowed. (Trial Tr. Vol.V P.985 L.24-P.986 L.25). Country club dues and personal memberships were deducted on the S-corporation and Mrs. Kelpe's automobile was owned by her personally, but it was depreciated o the business return. These deductions were disallowed. (Trial Tr. Vol.V P.3-21). Tax due in 2004 was $2,581.00 and tax due in 2005 was $13,439.00 for 2005. (Trial Tr. Vol.V P.987 L.22-P.988 L.3). No negligence penalties were assessed in either 2004 or 2005 against the Kelpes. (Trial Tr.

Vol.V P.988 L.10-17).  Ms. Voss did secure an affidavit from the Kelpes.  (Trial Tr. Vol.V P.989 L.8-11).

On cross-examination, Ms. Voss testified that information supplied by the Zerjav firm to the Chamberlins, concerning deductibility of wages paid to their children, provided that the children must do the work as a bone fide employee and receive reasonable compensation for the work effort.  (Trial Tr. Vol.VI P.1030 L.10-22) (Def. Ex. No.56).  She testified that the Chamberlins told her about the deduction for children's wages, but they "didn't come up with the proof."  (Trial Tr. Vol.V P.1000 L.4-8).  She knew that Mr. Chamberlin was a financial planner and a sophisticated taxpayer.  (Trial Tr. Vol.V P.1002 L.23-P.1003 L.3).  She believed that the Chamberlins deserved a negligence penalty, "I certainly did."  Mr. Chamberlin did pay the negligence penalty on his C-corporation.  (Trial Tr. Vol.V P.1013 L.21-25).

Ms. Voss described the "project meetings" concerning the FZ project as "meetings to gather the agents to discuss the cases."  She said that "we would just get a notice" and that there were about "half a dozen" meetings.  She described the subject matter of the meetings to be "the civil cases that we agents were working, the cases - - the returns signed by Frank Zerjav." (Trial Tr. Vol.VI P.1042 L.15-P.1043 L.2).

Ms. Voss testified that Mr. Kelpe was a real estate agent who paid himself $36,000.00 from the S-corporation as an annual wage.  Mr. Kelpe filed payroll tax returns consistent with that wage, but Ms. Voss thought the amount he paid himself was unreasonable, based on sales commissions of over $200,000.00 for the year audited.  She admitted that at the beginning of the year, a real estate agent would not know the extent of compensation he would earn in the ensuing year.  She agreed that an agent cannot know at the beginning of the year the amount he will earn

40

in commissions for the year.  Mr. Charles, representing the Kelpes agreed to "add $24,000.00 a year to wages," and Ms. Voss agreed to accept that.  (Trial Tr. Vol.VI P.1048 L.7-P.1049 L.7; P.1049 L.16-21; P.1052 L.11-23) (Def. Ex. No.40 and No.82).  She agreed that the additional amount was a sum that the taxpayer's representative proposed which she accepted as being reasonable.  By making an adjustment to the Schedule C instead of changing the amounts on the S-corporation, she "effectively collected the money for the Government without putting the taxpayers through an audit of their payroll tax returns."  She acknowledged that by taking the extra $24,000.00 in income and including it on Schedule C, it is not wages.  (Trial Tr. Vol.VI P.1053 L.1-11; P.1054 L.11-P.1056 L.2).

Ms. Voss testified that the Kelpes had paid for their personal health insurance and had omitted the amount from their tax returns, so she gave them the deduction.  In response to this question, "[a]nd so that means that over this two-year period, there is 20 - - almost 20 or $21,000.00 dollars worth of deductions which the Kelpes were entitled to which, for whatever reason, the Zerjavs firm didn't pick up," Ms. Voss testified, "[c]orrect." (Trial Tr. Vol.VI P.1056 L.15-19).  She acknowledged that she does not remember if this was because the Zerjav firm made a mistake or if the Kelpes failed to tell them, stating, "[a]ctually, the Kelpes weren't certain that Mr. Zerjav knew about it." (Trial Tr. Vol.VI P.1056 L.20-23).  She stated that this was not included in her summary chart, because she only included in her summary chart "items on there that we knew were attributable to Mr. Zerjav."  When she closed the case, she made a listing of items attributable to Mr. Zerjav, saying, "I think I just put a Post-It note on - - on the report before giving it to Mr. Stone." (Trial Tr. Vol.VI P.1056 L24-P.1057 L.10).  She recalled talking to Mr. Montana from the Zerjav firm, but she did not talk to him about the circumstances of the

preparation of the original tax returns, nor did she talk to anyone else from the Zerjav firm about the circumstances of the preparation of the original tax returns. She said she did not know how the "health insurance deduction got missed," nor did she know how the other deductions that were disallowed got put on the tax returns, but she said the "taxpayers described the process of gathering their financial information, and they described what was given to the Zerjavs." (Trial Tr. Vol.VI P.1058 L.6-20).

Ms. Voss was next asked if the Kelpes had any substantiation problems with respect to "meals, dues and subscriptions." She answered that meals were recorded in the detailed general ledger or detailed records provided to the Zerjavs, and dues and subscriptions were also listed in an account in the general ledger. She was asked whether these deductions are generally required to be substantiated under Section 274 by receipts, evidence of who was there, or evidence of the business purpose. Ms. Voss agreed, but testified that she did not require that kind of substantiation along with submission of the amended tax return. She said that she accepted the "taxpayer's numbers as reasonable," and Mr. Kelpe was not required to show her any receipts. When asked, "my question is whether this is your standard approach to this kind of issue?" She answered, "[i]s this my standard approach? Is the question: Is this my standard approach to not ask for substantiation?" The next question/declaration was "[y]es Ma'am." She answered, "[n]o, it's not." (Trial Tr. Vol.VI P.1058 L.21; P.1059 L.4-7; P.1061 L.3-16; P.1062 L.14-21).

On redirect examination, Ms. Voss identified Government's Exhibit Number 37 as documents provided by the Chamberlins during their examination. The documents include handwritten notes and sketches prepared by Mr. Chamberlin from information he received from the Zerjav firm. (Trial Tr. Vol.VI P.1070 L.11-14; P.1071 L.5-8; L.20-21; P.1072 L.6-9). On

recross-examination, she was repeatedly asked to specify how she had relied on Government's Exhibit 37 and what it was that she had relied upon. She did not identify any particular entry from that lengthy exhibit, rather she only gave general statements about reliance. Then in answer to a question regarding whether she relied on these documents in determining that the Chamberlins should be assessed a negligence penalty, she testified, "[m]y conclusion was Mr. Chamberlin was sophisticated enough. He should have known this was too good to be true." (Trial Tr. Vol.VI P.1077 L.15-P.1078 L.21).

Ms. Voss's testimony leads the Court away from concluding that Mr. Zerjav or the Zerjav firm are in violation of the statutes, contrary to the Government's prayer in this temporary injunction proceeding. She confessed that she did not comply in her audits with standard procedure, she had no information from the Zerjav firm concerning the reasons for the manner in which orginal returns were filed, and she made conclusions, in part, that were based on negotiated settlements with taxpayers or their legal representatives who point the accusing finger to Mr. Zerjav or the Zerjav firm to gain a personal favorable resolution with the Internal Revenue Service. Hers is yet another example of focusing on the goal of forcing Mr. Zerjav and the Zerjav firm out of business, not on the responsibility of objective investigatory practices to account for the fair and unbiased treatment of the rule of law.

Before Agent Mark Stone of the Internal Revenue Service testified, there was a lengthy record made concerning whether Government's Exhibit 27 should be received in evidence and whether Agent Stone should be permitted to reference that Exhibit in his testimony. It was settled that Agent Stone is not qualified as an expert witness. The Court specifically asked the Government's counsel, "[b]ut what I'm wondering is: You mentioned other agents. Will he be

recording information from other agents who have not testified?" Mr. Pahl answered "[y]es." He believed that Agent Stone should be able to "stand up and testify as to the ultimate tax loss to the Government, and that's in the chart." (Trial Tr. Vol.VI P.1091 L.2-20). Mr. Pahl said that the Government would be offering "something like three million dollars in tax loss to the United States Government." (Trial Tr. Vol.VI P.1093 L.2-3). The Court stated, "I still have lingering doubts about how he can in a sense adopt information from other agents who haven't testified." These doubts now, as the opinion is being drafted, are more profound, considering the unreliability of the testimony of agents who have attempted to show, unpersuasively, the responsibility of the Defendants for tax loss to the Government. The evidence clearly leads to the conclusion that many former Zerjav clients claimed a pattern of deductions unauthorized by the Tax Code. The evidence is slight that the unauthorized deductions were at the direction of the Zerjavs or any Zerjav entity.

Mark Stone testified that he has been a Revenue Agent with the Internal Revenue Service for more than 13 years. Agent Stone is a certified pubic accountant. At the time of the hearing in this case, he was Acting Group Manager and a member of the Abusive Tax Avoidance Transaction Unit ("ATAT"). He described the purpose of the ATAT, "[t]o investigate promoters and preparers for possible injunction and/or penalty action." (Trial Tr. Vol.VI P.1099 L.23-P.1100 L.10; P.1100 L.21-22; P.1101 L.3-15; P.1105 L.12-14). He testified that there were 40 to 50 Revenue Agents performing audits based on the ATAT investigation of the Zerjav firm at the peak time, between January or February 2007 and the beginning of 2008. One of his job duties involves reviewing audit files which contain the Revenue Agent's audit, commonly known as an RAR, along with the agent's case history, a chronology of what took place on the audit.

The report also has work papers, known as lead sheets, describing specific issues discovered through the audit. It would also include any taxpayer statements or affidavits that the agent may have obtained during the examination. (Trial Tr. Vol.VI P.1103 L.10-P.1104 L.6). He reviewed 312 return audits consisting of 173 taxpayer case files, with some taxpayers being a husband and wife. (Trial Tr. Vol.VI P.1104 L.22-24). Agent Stone was assigned to the Zerjav ATAT investigation in November 2006. When asked if the procedure by which his ATAT commenced the ATAT investigation was a "typical procedure," Agent Stone said, "[a]bolutely, yes." (Trial Tr. Vol.VI P.1106 L.13-24).

Agent Stone testified that the ATAT investigation was on a parallel track with a criminal investigation in the Department of Justice, and he had been instructed not to talk to the Zerjavs. He offered this testimony to explain why the agents did not seek information from the Zerjavs or any Zerjav entity. (Trial Tr. Vol.VI P.1109 L.12-24). He interviewed some of Defendants' prior employees and conversed with some of the Zerjav customers. He discussed "various cases and issues with the 40 to 50 Revenue Agents on the cases and reviewed their case files upon closure." He contacted former employees and Zerjav customers "[t]o get an understanding of how the Defendants' business operated and to find out if they could give me any insight into the Defendants' improper activities." He was not sure if he talked to all of the 40 to 50 agents, but he did talk to a "large number of them." (Trial Tr. Vol.VI P.111 L.1-19). He was familiar with the FZ Project Book, referring to it as the Job Aid or Audit Aid, but he claimed only a "minor part" in the preparation of the document. He "may have helped [the agents] on and off regarding preparation of an affidavit, giv[ing] them suggestions on format of the affidavit, things of that nature." (Trial Tr. Vol.VI P.1111 L.25-P.1112 L.5-12; P. 1112 L.19-P.1113 L.6). Government's

Exhibit 86, minutes from one of the conference call meetings with the Revenue Agents doing the audits, provides in part, "[p]ush for affidavits from TP." Mr. Stone opined that it meant, "try and obtain affidavits from the taxpayers, whenever possible." Another statement from that exhibit reads, "[d]o not trade affidavit for penalty." He said that meant, "[i]f a taxpayer is willing to provide an affidavit, pursue and obtain the affidavit, but the affidavit has no bearing on whether or not the taxpayer agrees or doesn't agree or anything of that nature." (Trial Tr. Vol.VI P.1116 L.23-P.1117 L.25; P.1119 L.2-5). In all, thirty affidavits were acquired from "202 agreed cases."[6] He said he thought there were 115 taxpayers. (Trial Tr. Vol.VI P.1119 L.13-24).

Agent Stone was familiar with the "amended return option." He described the terms of the option as follows: "First and foremost, the taxpayer had to agree to reverse all of the improper transactions. . . . Secondly, they would need to present the amended return to the Revenue Agent performing the audit as opposed to sending it in to the Service Center or dropping it at a taxpayer service walk-in center. . . ." The only other requirement was that "if the Revenue Agent determined that penalties were warranted on the taxpayer, one year of penalties would be applied or asserted on the tax year with the - - with the highest deficiency." (Trial Tr. Vol.VI P.1120 L.3-21; P.1121 L.2-8). He acknowledged that Mr. Zerjav did submit a few amended returns, but none were accepted. None of the taxpayers that Mr. Zerjav represented during the audit process were offered the amended return option. Agent Stone never met with Mr. Zerjav

---

[6]Although it is not significant in the Court's ruling of this case, at page 1122 of the transcript, Agent Stone testified that "out of the 173 taxpayers' case files that I reviewed, there were 41 taxpayers, I believe, is the number that participated in the amended return option." Of these he said, in response to the question, "[a]nd of these 41, again, how many did you obtain affidavits from?," he answered, "I believe it was 21."

because of the Criminal Investigation Division's request.  (Trial Tr. Vol.VI P.1122 L.7-12; P.1127 L.22-P.1128 L.1; P.1128 L.10-15).

Agent Stone explained that a transmittal letter, a Form 4665 T-letter, is a summary of issues, information that may not be available in the file that gets forwarded with the file to "Appeals," a separate division of the Internal Revenue Service.  In the Zerjav case, Agent Stone drafted a T-letter to be included in the audit files.  He drafted a T-letter in the Zerjav case because he wanted the Appeals to be aware "of all the facts and circumstances surrounding this particular taxpayer's case and that it wasn't just an isolated return; that it was part of a pattern." (Trial Tr. Vol.VI P.1131 L.24-P.1132 L.14; P.1133 L.7-8; P.1133 L.14-19) (Gov't Ex. No.2).

Agent Stone identified Government's Exhibit Number 27 as a chart containing the names of 173 taxpayers, "husband and wife considered to be one taxpayer, and any related entities they may have that was audited as part of their audit." (Trial Tr. Vol.VI P.1134 L.19-P.1135 L.7; P.1135 L.18-22).  The Government wants the Court to consider this Exhibit, prepared by Mr. Stone, as evidence of fault of Mr. Zerjav, Tiger, the Zerjav firm and all Zerjav entities.  The Court heard arguments and made statements as to whether Agent Stone was being proffered as an expert witness; whether, as the Government suggested, the issue as to admissibility of Government's Exhibit 27 was really not a question of the status of Agent Stone as a witness, but one of admissibility as a chart under Fed R. Evid.1006; and whether the Court should consider the Exhibit at all, because it contained information from documents never disclosed to Defendants and information added by Agent Stone that was not contributed by Revenue Agents, making it an expert report rather than a compilation.  The Court allowed further testimony of Agent Stone, considering his testimony for weight.

On cross-examination, Agent Stone testified, that as to the availability of the amended return offer for participation by Zerjav clients, he did not know for certain if that offer was communicated to Mr. Zerjav. He was asked, "[a]re you aware of any taxpayer who was represented by Frank Zerjav who was told that if he would just file amended tax returns and take a penalty in the highest year, at least just those two items, that he wouldn't have to go through an extended audit?" His answer was "I'm not aware of any." (Trial Tr. Vol.VI P.1176 L.14-25; P.1177 L.8-13). Agent Stone testified that the FZ Project involved 173 taxpayers and 312 returns, 202 returns "agreed" and 110 "unagreed." He admitted that slightly more than one-third of the audits on Exhibit 27 "aren't over" as far as the Internal Revenue Service is concerned. As to some of the "agreed" returns, he admitted that he did not know anything specific beyond the fact that the Revenue Agents reviewed the returns and decided whether to approve or accept the numbers on the 1040's. He said that 41 resulted from submission of amended returns. (Trial Tr. Vol.VI P.1182 L.14-17; P.1183 L.8-24; P.1184 L.12-24). He testified that he did not know, in other cases, whether the agreement was the process of some negotiations between the Internal Revenue Service and the taxpayer or the taxpayer's representative. He said that when shown a specific example, he would not call the result from negotiations, "but it's a fair outcome based on all the facts and circumstances." (Trial Tr. Vol.VI P.1187 L.13-P.1188 L.4; P.1189 L.9-13).

Agent Stone testified that he did not recall specific instances where the taxpayers on audit were allowed deductions not claimed on the original returns, "but there may have been a few." He admitted that his investigation did not attempt to factor into the missed deductions, whether those were missed by the taxpayers or missed by the Zerjav firm. (Trial Tr. Vol.VI P.1194 L.14-P.1195 L.5).

On further cross-examination, Agent Stone testified that there was "a good possibility" that he was aware that a "conflicts of interest" letter signed by Revenue Agent Gally was sent to Mr. Zerjav in January 2007, after Agent Stone had received an admonition by personnel of the criminal investigation of the Defendants. (Trial Tr. Vol.VI P.197 L.12-P.198 L.24). At the bottom of the standard letter, there is a reference to *Circular* 230. Agent Stone was asked, it says, "[a]s long as the taxpayer has been made aware of the fact that there is a potential conflict, the taxpayer can waive that, right?" Agent Stone said, "[c]orrect." He admitted that he did not know if he had those conflict letters from all of the taxpayers. He was asked, "[h]ave you ever in your review of the case files, to the best of your recollection, come across a file where there was not a written waiver of conflict?" He answered, that he could not say yes or no, but recalls files "with it being in it, but I can't say for certain I recall files with it or not being in it." (Trial Tr. Vol.VI P.1199 L.5-P.1200 L.17) (Gov't Ex. No.11). Agent Stone acknowledged that Mr. Zerjav's attorney sent a letter dated January 30, 2007, to Ms. Gally and Ms. Wensing, which appears to be a response to Ms. Gally's January 11, 2007 letter with the *Circular* 230 language. The attorney's letter says that he has executed a power of attorney on behalf of Mr. Zerjav and asks for a meeting. Agent Stone testified that he did not know if the Internal Revenue Service responded to that letter. (Trial Tr. Vol.VI P.1200 L.18-P.1201 L.22).

On April 25, 2007, Agent Stone wrote to "Mr. Zerjav directly," advising him that the Internal Revenue Service was in the process of reviewing his participation and conduct and activities that might result in understatement of taxpayers' federal liability and other persons might be contacted. Agent Stone further advised Mr. Zerjav that if he had any questions to contact him. Agent Stone was then asked, "[t]hat's the same employee that was told not to have any contact

with Mr. Zerjav. Is that right?" Agent Stone answered "[c]orrect." (Trial Tr. Vol.VI P.1203 L.12-19; P.1204 L.18-25) (Gov't Ex. No.14). Agent Stone testified that Mr. Zerjav's same lawyer asked for another meeting and asked for further and more detailed information relating to Agent Stone's letter of April 25, 2007. Agent Stone told Mr. Zerjav's lawyer that he was not at liberty to discuss the matter without counsel being present. Agent Stone was asked if he asked the lawyer for dates when he and Mr. Zerjav could meet. Agent Stone testified that he did not recall that. (Trial Tr. Vol.VI P.1206 L.20-P.1208 L.7). He recognized that the attorney's letter stated that the sooner the Service provided particulars regarding so-called abusive tax voidance transactions, the sooner Mr. Zerjav would be in a position to advise his clients. Agent Stone responded in a letter dated May 25, 2007, where he stated that after discussing the matter with counsel "we will not be meeting with you or Mr. Zerjav regarding any civil investigation, nor will we have any further communication with you or Mr. Zerjav regarding this matter." (Trial Tr. Vol.VI P.1208 L.12-25; P.1209 L.13-P.1210 L.10) (Gov't Ex. No.17) .

Agent Stone testified in direct examination that the sending of transmittal letters are standard where the subject of the investigation is representing taxpayers before the Internal Revenue Service, but in the case of his transmittal letters to Appeals, he had never before sent a transmittal letter, nor drafted language like this in any other preparer case. He testified in his deposition, "[t]his is the only time this has ever happened." (Trial Tr. Vol.VI P.1220 L.25-P.1222 L.23). Agent Stone was recalled on redirect examination and testified that as Lead Agent, he had never before issued a similar type T-letter. (Trial Tr. Vol.VI P.1235 L.16-25). This appears to be a violation of due process that should be further explored.

After Mr. Stone was excused, the Court, by agreement of the Parties, accepted Government's Exhibit Number 27 with the "Zerjav loss" redacted. (Trial Tr. Vol.VI P.127 L.13-18). Considerable debate followed as to the relevance and reliability of Exhibit 27. The Court stated that it would be received in redacted form pertaining to amounts attributable to Zerjav & Company and the "center section" would not be considered. (Trial Tr. Vol.VI P.1233 L.10-15).

## II.    MOTION FOR PRELIMINARY INJUNCTION

## A.    LEGAL STANDARD

The Government seeks a preliminary injunction against Defendants under 26 U.S.C. §§ 7407, 7408, and 7402. Section 7407 provides that:

> if the court finds (1) that a tax return preparer has (A) engaged in any conduct subject to penalty under section 6694 or 6695, or subject to any criminal penalty provided by this title, (B) misrepresented his eligibility to practice before the Internal Revenue Service, or otherwise misrepresented his experience or education as a tax return preparer, (C) guaranteed the payment of any tax refund or the allowance of any tax credit, or (D) engaged in any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue laws, and (2) that injunctive relief is appropriate to prevent the recurrence of such conduct, the court may enjoin such person from further engaging in such conduct.

26 U.S.C. § 7407(b). Section 7408 provides that: "if the court finds (1) that the person has engaged in any specified conduct, and (2) that injunctive relief is appropriate to prevent recurrence of such conduct, the court may enjoin such person from engaging in such conduct or in any other activity subject to penalty under this title." 26 U.S.C. § 7408(b). The statute goes on to state that "'specified conduct' means any action, or failure to take action, which is (1) subject to penalty under section 6700, 6701, 6707, or 6708, or (2) in violation of any requirement under regulations issued under section 330 of title 31, United States Code." 26 U.S.C. § 7408(c).

Finally, Section 7402 is a catch-all provision that generally provides that "[t]he district courts of the United States, at the instance of the United States shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction . . . as may be necessary or appropriate for the enforcement of the internal revenue laws."  26 U.S.C. § 7402(a).

With respect to relief sought under Sections 7407 and 7408, this Court is not required to consider the traditional equitable factors applied in non-statutory injunctive relief cases (as set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)), because the injunctive relief requested is expressly authorized by statute.  *See United States v. Sonibare*, 504 F. Supp. 2d 566, 573 n.5 (D. Minn. 2007) (citing *Abdo v. U.S. IRS*, 234 F. Supp. 2d 553, 564 (M.D. N.C. 2002)).  However, considering the exceptional facts of this case and as discussed in further detail in the Discussion Section, the Court finds the *Dataphase* factors to be highly relevant.[7]

As provided in *Dataphase*, "whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Dataphase*, 640 F.2d at 114.  The "[f]actors are not a rigid formula,'" *Branstad v. Glickman*, 118 F. Supp. 2d

---

[7]In his opening statement, Mr. Bruntrager, counsel for Defendants, referenced *Dataphase*, and argued that the Government had a heavy burden to sustain in proving pleaded fraud.  Mr. Roessner, counsel for the Government, confirmed that the Government would show "that Defendants continue to take unrealistic positions on the returns.  Moreover, what we believe this evidence will show the Court is that this went beyond merely unrealistic positions; it was fraudulent positions, and - - and - - and that is what we intend to show today to the Court." (Trial Tr. Vol.I P.6,18).  The Government has never advocated that the statutes upon which its case is fashioned need not be analyzed under *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F. 2d 109, 114 (8th Cir. 1981).

925, 938 (N.D. Iowa 2000) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07

(1959)), and, "[i]n balancing the equities, no single factor is determinative." *Dataphase*, 640 F.2d

at 113. The burden of establishing that preliminary relief is warranted is on the party seeking the

injunction. *Id.*

## B.    DISCUSSION

### 1.    *Injunctive Relief Under Section 7407 and Section 7408*

The Court begins by noting that both Section 7407 and Section 7408 specifically require a

court to determine that "injunctive relief is *appropriate* to prevent the recurrence of such

conduct," in order to grant the requested injunctive relief. 26 U.S.C. § 7407(b)(2) (emphasis

added); 26 U.S.C. § 7408(b)(2) (emphasis added). The statutes do not explain what is meant by

"appropriate," nor do they set forth a standard for determining appropriateness. Left to

independently determine what is appropriate, this Court is of the opinion that the *Dataphase*

factors set forth above are instructive in determining the appropriateness of injunctive relief. *See,*

*e.g.*, *Canady v. Allstate Ins. Co.*, 282 F.3d 1005, 1020 (8th Cir. 2002), *abrogated on other*

*grounds by Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28 (2002) ("[i]n determining whether

[statutory] injunctive relief is appropriate, we consider the *Dataphase* factors"); *Reynolds v.*

*Rehabcare Group E. Inc.*, 531 F. Supp. 2d 1050, 1056 (S.D. Iowa 2008) ("In this Circuit, the

four-part test enunciated in *Dataphase* . . . is applied to determine if preliminary injunctive relief is

appropriate."). The Court will, thus, apply the *Dataphase* factors to the facts of this case to

determine if the requested preliminary injunctive relief is appropriate.

###### a.     *Threat of Irreparable Harm to Movant*

The first factor to be considered under the *Dataphase* analysis is the threat of irreparable harm to the movant.  In this case, the harm that the Government will suffer if this Court does not issue a preliminary injunction is not significant.  The Government brought this action initially seeking a permanent injunction prohibiting Defendants from, among other things, preparing and filing income tax returns for others and representing a person or organization under examination by the Internal Revenue Service.  They seek exactly the same relief in the present Motion, in the form of a preliminary injunction.  Thus, if this Court determines not to issue a preliminary injunction in this case, the only harm that will result to the Government is that it will have to wait until the completion of the trial on the merits and the Court's decision regarding the issuance of the permanent injunction.  It is true that, during this time, the Defendants will continue to assist taxpayers with the preparation of tax returns.  If the allegations of fraudulent activity made by the Government are true, a conclusion not reached by this Court today, there will be more returns to audit and possibly more tax understatements to collect.  However, these consequences are minor, especially considering that any tax understatements can be cured through monetary damages.  *See Windstream Corp. v. Berggren*, 2008 WL 5423850, at *4 (D. Neb. 2008) ("no threat of irreparable harm exists if any injury that arises prior to the resolution of the litigation can be remedied by an award of money damages").  The Government will be inconvenienced and will incur additional expenses.  *Blaich v. Nat'l Football League*, 212 F. Supp. 319, 323 (S.D. N.Y. 1962) ("inconvenience does not, in and of itself, constitute irreparable injury").  Given the facts of this case, it simply cannot be said that the Government would face significant irreparable harm if

this Court declines to issue the preliminary injunction against Defendants. Thus, this factor weighs against granting the preliminary injunction.

### b.    *Balance of Harm*

The next factor to consider is the state of balance between the harm to the movant and the injury that granting the injunction would have on the other parties. In this case, if preliminary injunctive relief is granted to the Government, the injury to Defendants would be very severe, if not catastrophic. Granting preliminary injunctive relief as requested would close Defendants' business. The nature of a certified public accountant firm dictates that a client base be maintained from year to year. If the Court grants the requested injunctive relief to the Government, before there can be a scheduled hearing on the merits, Defendants would be required to notify all clients of the necessity for them to seek other professional services. Defendants would be required to bear the burden of proceeding with the litigation without a financial base and with the prospect that, even with a judgment on the merits in their favor, there would be no business to conduct.

In considering the balance between the relatively insignificant harm that the Government would suffer if this Court did not issue a preliminary injunction and the massive harm that will fall upon the Defendants as the result of the preliminary injunction, it is clear that this factor weighs against granting a preliminary injunction.

### c.    *Probability of Success on the Merits*

The third factor is the probability that the movant will succeed on the merits. To prove probability of success on the merits, the party seeking preliminary relief needs to show that "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. Because of the

equitable nature of the proceedings, the court's approach must be flexible "to encompass the particular circumstances of each case." *Id.* "The likelihood that plaintiff will ultimately prevail is meaningless in isolation" and "must be examined in the context of the relative injuries to the parties and the public." *Id.* "If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits." *Id.*

Because this Court has concluded that the chance of irreparable injury to the Government is outweighed by the likely injury to other parties, the Government faces a heavy burden in demonstrating to this Court that it is likely to prevail on the merits. This heavy burden is one that the Court concludes the Government cannot meet at this stage of the proceedings. The evidence set forth by the Government, at this point in time, fails to demonstrate that Defendants were responsible for the unreasonable deductions taken by the taxpayers at issue in this case. Rather, based on the evidence presented, it appears that the responsibility for the unreasonable deductions lies with the taxpayers themselves and that the Government's investigation was misdirected. Many of the witnesses offered by the Government in support of its case were unreliable, and appeared to have a personal grudge against the Defendants, incomplete information, or personal interests to protect. It is important to note that this conclusion does not mean that the Government will not ultimately be able to prevail on the merits after presenting additional evidence; rather, the Court merely concludes that, at this time, the evidence presented by the Government is not sufficient to meet its heavy burden in demonstrating that it is likely to prevail on the merits. Thus, this factor weighs against granting the preliminary injunction.

### d. *Public Interest*

The fourth and final factor is consideration of the public interest.  It is clear that the public has an interest in being protected from fraudulent tax return preparers and in having access to competent preparers.  *See United States v. Sonibare*, 2006 WL 662450, at *4 (D. Minn. 2006).  At the same time, there is a prevailing interest in preventing the Government from overstepping its role in investigating alleged fraud and in seeking to prevent further wrongdoing.  As set forth by the United States District Court for the District of Nebraska, "there is a strong public interest in assuring the proper and efficient functioning of the government.  This includes the *fair administration* of federal tax laws and the proper and efficient collection of taxes to support the federal government and its programs and policies."  *United States v. Knudson*, 959 F. Supp. 1180, 1187 (D. Neb. 1997) (emphasis added).  Although the court in *Knudson* used this rationale to support the granting of a preliminary injunction, in this case, to this point, the evidence suggests that the Government's investigation of the Defendants was far from fair.  It appears that the Government set the goal of shutting down Defendants' business and, in relentlessly attempting to achieve that goal, misdirected the focus of its investigation.  As previously noted, the responsibility for the unreasonable deductions likely lies with the taxpayers themselves, thus the Government's decision to essentially ignore this responsibility and focus on the Defendants was an unreasonable one.  This type of investigation is certainly not in the best interest of the public and will not be rewarded.  Thus, this factor weighs against granting the preliminary injunction.

### e. *Conclusion of Dataphase Analysis*

Each of the four *Dataphase* factors weighs against granting the preliminary injunction.  As a result, this Court concludes that granting preliminary injunctive relief at this time would be

wholly inappropriate.  Because injunctive relief is not appropriate, the Court can conclude that the Government's request for a preliminary injunction under Section 7407 should be denied, without reaching the issue of whether Defendants engaged in any of the wrongful conduct set forth in 26 U.S.C. § 7407(b)(1).  Further, the Court can conclude that the Government's request for a preliminary injunction under Section 7408 should be denied, without reaching the issue of whether Defendants engaged in any of the specified conduct set forth in 26 U.S.C. § 7408(c).  *See also* 26 U.S.C. § 7408(b)(1).

> ### 2.  *Injunctive Relief Under Section 7402*

The *Dataphase* factors are also pertinent to the analysis of indicated relief under 26 U.S.C. § 7402, because "the decision to issue an injunction under § 7402(a) is governed by the traditional factors shaping the district court's use of the equitable remedy."  *United States v. Ernst & Whinney*, 735 F.2d 1296, 1301 (11th Cir. 1984).  Applying the same *Dataphase* analysis set forth above, it is clear that each of the traditional equitable factors weighs against granting a preliminary injunction under Section 7402.  Thus, the Government's request for relief under this Section should be denied.

## III.  MOTIONS IN LIMINE

## A.  ADVERSE INFERENCE BASED ON TIGER'S ASSERTION OF THE FIFTH AMENDMENT

The Government requests that this Court draw an adverse inference against Tiger Zerjav, and all of the Defendants, based on Tiger's assertion of the Fifth Amendment.  "[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."  *Baxter v. Palmigiano*, 425 U.S.

58

308, 318 (1976). However, "silence alone is insufficient to support an adverse decision." *Koester v. Am. Republic Invs., Inc.*, 11 F.3d 818, 823-24 (8th Cir. 1993). Rather, "silence . . . [is] only one of a number of factors to be considered by the finder of fact in assessing a penalty, and [is] given no more probative value than the facts of the case warranted." *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977) (citing *Baxter*, 425 U.S. 308).

In this case, in requesting the adverse inference, the Government has relied solely on Tiger's assertion of the Fifth Amendment in his Answer (with respect to 26 of the 122 paragraphs in the Complaint) and "independent evidence showing Tiger Zerjav's involvement in defendants' fraudulent tax return preparation business." (Govt.'s Brief in Support of Motion, doc. #85, p.5). As established in the Findings of Fact and the preliminary injunction analysis, this Court has concluded that the evidence presented by the Government fails to demonstrate that Defendants were responsible for the unreasonable deductions taken by the taxpayers at issue in this case. Without additional evidence demonstrating that Tiger was involved in allegedly fraudulent tax return preparation, the Government is relying solely on Tiger's silence in seeking its adverse inference. Because "silence alone is insufficient to support an adverse decision," *Koester*, 11 F.3d at 823-34, this Court cannot grant the Government's request that an adverse inference be drawn against Tiger Zerjav, or any other Defendant.[8]

---

[8]The Court notes that Defendants set forth a persuasive argument regarding the Government's failure to call Tiger Zerjav to testify. Specifically, they argue that because the Government did not attempt to depose Tiger or call him to the stand, he never actually asserted his Fifth Amendment rights in response to probative evidence offered against him. Although this argument is persuasive, the Court need not address it at this time because it rejects the requested adverse inference on other sufficient grounds.

**B.    ADVERSE INFERENCE BASED ON MICHAEL MONTANA'S ASSERTION OF
THE FIFTH AMENDMENT**

The Government also requests that this Court draw an adverse inference against all

Defendants, based on their former employee Michael Montana's assertion of the Fifth

Amendment.  The Second Circuit, in *Libutti v. United States*, set forth "a number of non-

exclusive factors which should guide the trial court" in determining whether to draw an adverse

inference based on "a non-party's invocation of the Fifth Amendment privilege against self-

incrimination in the court of civil litigation."  107 F.3d 110, 123 (2d Cir. 1997) (the factors are

gleaned from "the evolving case law," including two Eighth Circuit cases: *Cerro Gordo Charity v.

Fireman's Fund American Life Insurance Co.*, 819 F.2d 1471 (8th Cir. 1987), and *Rosebud

Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509 (8th Cir. 1984)).  The factors are: the nature of the

relevant relationships; the degree of control of the party over the non-party witness; the

compatibility of the interests of the party and non-party witness in the outcome of the litigation;

and the role of the non-party witness in the litigation.  *Id.* at 123-24.  However, "the overarching

concern is fundamentally whether the adverse inference is trustworthy under all of the

circumstances and will advance the search for the truth."  *Id.* at 124.

The Court has not been presented with much information regarding Mr. Montana's

invocation of the Fifth Amendment.  The only information provided by the Government is that

Mr. Montana is a former employee of the Defendants, that he conducted some of the Advisory

Group coaching sessions and assisted in the preparation of federal tax returned, and that he acted

at the direction of Mr. Zerjav and Tiger.  (Govt.'s Brief in Support of Motion, Doc. #87, p. 3).

Because Mr. Montana is no longer an employee of Defendants, the Court cannot draw any

conclusions regarding Mr. Montana's interests in the litigation or the level of control, if any, that Defendants have over Mr. Montana. It is also unclear how great of a role Mr. Montana played in the activities at issue in this case. The Court is able to conclude, however, that drawing an adverse inference against Defendants would not "advance the search for the truth." *LiButti*, 107 F.3d at 124. As set forth numerous times in this Memorandum and Order, the Court has determined that the evidence presented by the Government fails to demonstrate that Defendants were responsible for the unreasonable deductions taken by the taxpayers at issue in this case. Drawing an adverse inference to the contrary would not at this time advance the Court's search for the truth. Thus, this Court will not grant the Government's request that an adverse inference be drawn against the Defendants, based on Michael Montana's assertion of the Fifth Amendment.

## IV.    CONCLUSION

The Court determines that preliminary injunctive relief is inappropriate at this time and, thus, denies the Government's requests for such relief under Section 7407 and Section 7408 at this time. Further, because injunctive relief is inappropriate under the *Dataphase* traditional equitable factors, this Court also denies the Government's request for relief under Section 7402 at this time. Additionally, the Court denies the Government's request for an adverse inference against Tiger Zerjav and all Defendants, based on Tiger's assertion of the Fifth Amendment. The Court also denies the Government's request for an adverse inference against Defendants, based on Michael Montana's Assertion of the Fifth Amendment. Finally, Defendants' Joint Motion to Strike Plaintiff's Additional Affidavits and any other pending oral motions to strike are denied as moot.

Accordingly,

**IT IS HEREBY ORDERED** that United States' Motion for Preliminary Injunction [doc. #18] is **DENIED**.

**IT IS FURTHER ORDERED** that United States' Motion in Limine to Draw an Adverse Inference Against Tiger Zerjav and All Defendants [doc. #84] is **DENIED**.

**IT IS FURTHER ORDERED** that United States' Motion in Limine to Draw an Adverse Inference Against Defendants Based on Michael Montana's Assertion of the Fifth Amendment [doc. #86] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Joint Motion to Strike Plaintiff's Additional Affidavits and Memorandum in Support [doc. #88] and any other pending oral motions to strike are **DENIED, as moot**.

Dated this <u>31st</u> Day of <u>March</u>, 2009.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE